718 So.2d 874 (1998)
Priscilla C. DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. 97-2331.
District Court of Appeal of Florida, Fifth District.
September 4, 1998.
Rehearing Denied October 14, 1998.
James B. Gibson, Public Defender, and Brynn Newton, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Rebecca Roark Wall, Assistant Attorney General, Daytona Beach, for Appellee.
GRIFFIN, Chief Judge.
Appellant, Priscilla Davis, appeals her conviction of three counts of exploitation of an elderly person. She contends that a video-tape *875 of the alleged victim was improperly admitted in evidence. We agree and reverse.
In 1983, Mary Masters ["Masters"] established a trust of certain Vilano Beach property for her grandchildren. The first trust included granddaughter Sandra King as a beneficiary while a second trust in 1984 excluded her. In January of 1995, Masters became ill and needed care. Appellant, another granddaughter, agreed to go to Summerville where Masters was found in bad physical health. Ultimately appellant moved in with her grandmother to care for her.
In May 1995, appellant and her grandmother visited attorney Richard Chamberlin to review the will and power of attorney that had been drafted for Masters by a paralegal service. Chamberlin questioned Masters in private about her reasons for disinheriting former beneficiaries and was concerned about legal deficiencies in the documents. Masters rejected his advice to draft a will that would minimize conflict, responding that the disinherited had caused her many problems over the years. He testified that Masters was very definitive in her intent.
Chamberlin redrafted the power of attorney and a "pre-need guardianship" for Masters to assuage her concerns about having adequate health care and her fear of being put in a nursing home. Appellant was named the pre-need guardian. Then, in June 1995, Chamberlin prepared a new will for Masters, naming appellant as the sole beneficiary of her estate.
Chamberlin testified that during all five of his meetings with Masters, he spoke alone with Masters and he sought to determine that she understood the nature and terms of the documents. Chamberlin testified that Masters was responsive to his questions and made intelligent decisions. Chamberlin testified that overall Masters appeared competent. He professed to be shocked to learn that she was determined to be incompetent a few months after their consultations. According to Chamberlin, appellant had nothing to do with decision-making and was not in the room for the most important discussions.
Chamberlin indicated that Masters' desire to make a gift of the Vilano Beach property solely to appellant raised red flags in his mind. Chamberlin accordingly arranged a sale of the property appraised at $169,530.00 in exchange for a mortgage note from appellant for $85,000 at 5.75% interest. Chamberlin testified that he anticipated disapproval from other family members so he drafted affidavits for Masters and appellant that evidence knowledge that the property was worth more than the purchase price and expressing Masters' appreciation for appellant's care.
According to the testimony, in October 1995, other siblings of appellant saw appellant's van parked at a restaurant. They testified that when they entered the restaurant, appellant had thrown water on Masters, and Masters was dirty and "nasty". Master's daughter, on the other hand, testified that Masters had knocked a glass of water over while talking. One sibling testified that Masters had indicated to him that she wanted to leave with him but was afraid that appellant would hurt her. Appellant's brother then carried Masters out of the restaurant. Appellant requested that management call the police, but this was not done. Masters was placed in a nursing home shortly thereafter.
Dr. Baringer, a psychiatrist who examined Masters on October 9, 1995, testified that he diagnosed her as suffering from senile dementia, grossly impaired memory, cognition and general intellect. Another psychiatrist, Dr. Tueth, a geriatric psychiatrist testified that, based on his review of the discovery (he never met Masters), he was quite confident that Masters did not have the capacity to consent to the transfer of her real property. Tueth said he found "uncanny parallels" between appellant and other abusers of the elderly. He even testified that the appellant's "characteristics" met all six of the characteristics of elder abusers, although he could only recall five.[1] This testimony was not objected to.[2] He offered his opinion that *876 appellant did exercise control over Masters. Both psychiatrists testified that one suffering from senile dementia and impaired memory and cognition could be easily influenced by others, especially whoever served as the caregiver. Both psychiatrists also testified that it was probable that one diagnosed with senile dementia in November would have suffered from dementia six months earlier.
Another physician who had treated Masters from 1991-1995 for various health concerns testified that he saw no signs that she was not lucid. Her attorney ad litem further testified that she appeared fairly lucid when he met with her, but noted that Masters was confused in 1996 at the hearing on her competency.
In late October 1995, after Mrs. Masters had come under the control of the other grandchildren and after she had been found incompetent by Dr. Baringer, a law enforcement agent conducted a videotaped interview with Mrs. Masters. In the course of the interview, Mrs. Masters told some rather unusual and confused stories of jewelry being sawed off her hands and terrible beatings at the hands of appellant. After these references were redacted, over repeated, strenuous defense objection, the lower court allowed the videotape of the interview to be played to the jury. As edited, Mrs. Masters appears lucid (indeed more alert in some ways than her interrogators). The videotape includes some inconsequential talk about important events in Mrs. Masters' earlier life, but the tape mainly contains extremely negative comments about the appellant by Mrs. Masters. Even though the expert testimony made clear that because of her dementia, Mrs. Masters was likely to be extremely influenced by a need to please her caretakers at the time she gave the statement, the court allowed this October 1995 hearsay for the limited purpose of showing the victim's "state of mind" in May and June 1995i.e. that she was confused and incompetent. This evidently was allowed because the experts said that a person who was incompetent in October, when the interview was conducted, was probably demented to some unquantified degree several months before when she signed the documents at issue. The tape was evidently allowed in by the court to show the jury the "state of her mind" in November in order to illustrate the demented "state of her mind" in the preceding May or June.
Whatever marginal value the tape may have had for the stated purpose of corroborating Masters' incompetence, the principal effect of the tape was to reflect the elderly victim's dislike of the defendant:
Mr. Bibb: Priscilla who? Do you know Priscilla's last name?
Mrs. Masters: No, I don't.
Mr. Bibb: Is that the lady that was at
Mrs. Masters: That's the wretch. And she's my relative, but I couldn't trust her to turn my back.
Mr. Bibb: So Priscilla moved into your house; is that correct? Do you know who moved into your house with Priscilla?
Mrs. Masters: Well, there was somebody living for a while.
Ms. Lumpkin: Do you know how you're related to Priscilla?
Mrs. Masters: Well, she was my husband'sshe was Wally, my husband's, sister's child. And she's a little devil, if they ever made one, the way she (inaudible) the house.
Ms. Lumpkin: Well, what do you want to do, Mary?
Mrs. Masters: What do I want to do? I don't want toI'm not trying to do nothing.
Ms. Lumpkin: No. I mean what do you want to do in your life? Where do you want to stay?
Mrs. Masters: Well, I ain't got too much of it left, you know.
Mrs. Lumpkin: I hope you do.
Mrs. Masters: Well, I do, too, but I don't(inaudible). I mean, now Prissy and that other girl, she stayed with me for a little while and they gone (inaudible). But her sister is a lovely person.
Mr. Bibb: Let me ask you something, Mary.
Mrs. Masters: I don't like to see no oneI don't know.

*877 Mr. Bibb: But you don't ever want her taking care of you again, do you?
Mrs. Masters: Oh, God, I would rather carry my bed on my head. She couldn't come in my house.
Mr. Bibb: But do you want us
Mrs. Masters: No. No, because it's just a weakness she's got.
* * * * * *
Ms. Lumpkin: Okay. Did she come back to your house?
Mrs. Masters: She would. She's got more guts than you got teeth.
* * * * * *
Mr. Bibb: Is anybody right now mistreating you in any way?
Mrs. Masters: No way.
Mr. Bibb: And you
Mrs. Masters: (Inaudible).
Mr. Bibb: Okay. So there's no chance Priscilla is going to come mess with you right now?
Mrs. Masters: Well, now, she tried to worm her way back, but no chance.
The questions asked betrayed a clear attitude on the part of law enforcement that appellant was a threat to Mrs. Masters and her responses reflected Mrs. Masters' then current loathing of appellant. To admit the tape to show Masters'"state of mind" (i.e. her incompetence) six months earlier is both legally doubtful and logically weak. Even if the videotape were not hearsay, none of the videotape was related to the crimes charged except in the most marginal way. Showing this tape lobbed the proverbial skunk into the jury box, and deprived the defendant of a fair trial.
REVERSED and REMANDED.
DAUKSCH and ANTOON, JJ., concur.
NOTES
[1] The ones he identified were: (1) a relative, (2) living with the victim, (3) financially dependent, (4) a history of sociopathic behavior (5) substance abuse
[2] Defense counsel had repeatedly objected to Dr. Tueth's testimony but was consistently overruled and, by this point, he had quit objecting.