970 So.2d 312 (2007)
Roy Lee McDUFFIE, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-587.
Supreme Court of Florida.
November 21, 2007.
*316 Todd G. Scher, Miami Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Roy Lee McDuffie appeals his convictions of first-degree murder of Dawniell Beauregard and Janice Schneider, robbery with a firearm, and false imprisonment while armed and his sentences of death for the murders. We have mandatory jurisdiction. See art. V, § 3(b)(1), Fla. Const. We conclude that errors occurred during the course of the trial which, when viewed cumulatively, are not harmless beyond a reasonable doubt. Therefore, we reverse McDuffie's convictions, vacate his sentences, and remand for a new trial. Because we conclude that reversible error occurred in the guilt phase of the trial, we do not discuss the penalty phase issues.

FACTS
This case involves the October 25, 2002, murders of Dawniell Beauregard and Janice Schneider, two employees of the Dollar General store on Deltona Boulevard in Volusia County. Several hours after 8 p.m., the normal closing time for the store, Beauregard and Schneider were found shot to death in the back office of the store after a family member reported Schneider missing. The exact time that Beauregard and Schneider were shot is unknown, but popping sounds were heard from the vicinity of the Dollar General around 9:10 p.m. Both victims died from close contact gunshots to the head, although each had cutting wounds on their necks. Additionally, Schneider had a gunshot wound to her abdomen. Beauregard, whose mouth was taped, was bound with duct tape on her hands and feet. It appeared that Schneider, who was not bound with tape, had been able to cut the duct tape on Beauregard's feet before being killed. The store was found with the lights on and the doors locked. Cash from that day in the amount of $4,946.17, along with checks in the amount of $1,467.76, were missing. The money, checks and bank bag were never recovered. The murder weapon was also never found.
Roy McDuffie was eventually charged with the murders but the only physical evidence linking him to the crimes was a partial palm print on duct tape taken from Beauregard's wrists. McDuffie, who was an employee of Dollar General at the time, testified at trial that he had used the tape earlier that day to assist a customer who needed some boxes assembled. Other circumstantial evidence and an eyewitness identification linked McDuffie to the scene close in time to when the murders probably occurred. The eyewitness identification, although admissible, was subject to challenge.
*317 We discuss the evidence in detail because, although there was competent, substantial evidence to support the jury's verdict, the State has not demonstrated that the errors that occurred were harmless beyond a reasonable doubt. The evidence at trial revealed that McDuffie, a local youth-league football coach, had been hired as an assistant manager trainee for Dollar General earlier that week and had been training at the Deltona store. Because his second car had been repossessed, he and his wife, Troy, were carpooling. McDuffie took his wife to her nursing assistant job Friday, October 25, and then went to The Coca-Cola Company offices where he filled out papers for a new job he had just accepteda fact he had shared with his immediate supervisor, Linda Torres, but no one else. He planned to work just one week at Dollar General and then take the Coca-Cola job on the following Monday.
McDuffie attended a Dollar General meeting at another location for most of the afternoon, then picked up his wife from her job at about 5:15 p.m. and drove to the Deltona Dollar General. Troy McDuffie stayed in the store for a while and then went next door to the Winn-Dixie to buy a money order. As closing time approached, she left the store and sat in the car to wait for McDuffie where she reclined in the seat and rested.
Employee Carol Hopkins was working the cash register at the front of the store while McDuffie, Schneider, and Beauregard did the closing procedures. This involved cleaning up the store, counting the cash in the cash register drawers and cash that had been placed in the safe during the day, and preparing the bank deposit bag into which the day's cash and checks would be placed. This nightly closing procedure usually took thirty to forty-five minutes to complete.
After locking up the store at 8 p.m., Beauregard and McDuffie stayed mainly in the back office counting out the cash register drawers and filling out the paperwork for the bank deposit. A tear off tag from the bank deposit bagsomething that is one of the last things done during closingbore both Beauregard's and McDuffie's signatures, indicating McDuffie was still in the store at that point in the process. Beauregard had banded the money, sealed and pulled off the tab from the bank deposit bag, and locked the bag in the safe. They then left the office, locked the office door, and went to the front of the store to do a final register reading.
Store policy required that there always be two people in the office with the cash, and that if three or fewer employees close the store, they must always leave together. Because there were four employees in the store that evening, and cashier Carol Hopkins' register had been counted, she clocked out at 8:34 p.m. and asked if she could leave for the day. As she was leaving the Dollar General, she saw two men sitting on a bench outside the store, which she thought was suspicious. She later gave law enforcement investigators descriptions of the men and composite drawings were created based on her descriptions.
Olivia Sousa was working that night at her restaurant in the Deltona Plaza where the Dollar General is located. Around 9:30 p.m., she walked to the Winn-Dixie and on her way back to the restaurant, she saw a black man inside the Dollar General walking toward the back of the store. She did not see his face but he was wearing a black shirt and tan pants, which was the Dollar General uniform. Earlier in the week she had noticed a black man, who was a new employee, working in the store. McDuffie was the only black employee working at the Deltona store that week. Ms. Sousa *318 could not say the man she saw on October 25 was that same man, but he appeared to have a similar build.
At approximately 9:27 p.m., Alex Matias was standing next to his truck in the parking lot in the vicinity of the Dollar General and the Winn-Dixie talking on his cell phone. He noticed the Dollar General store lights were still on. This was unusual because the store closes at 8 p.m. and the lights are usually off by 8:45 p.m., a fact known to him because he used to work at the Dollar General. Matias testified that he saw a black male unlock the Dollar General door from the inside, open it, relock it, go to a dark-colored car in the parking lot, and open the car's back door. The man then shut the car door, returned to the store, unlocked the door, entered, and relocked it. Each locking and unlocking procedure required a separate key. This same process happened a second time. Matias did not see anyone in the car and did not see the man carrying anything to the car.
Matias was a friend of Dawniell Beauregard's sister, Crystal, and spoke with her the day after the murders. At her urging, he called the Sheriff's office and met with investigators to report what he had seen. Matias met with police and gave a composite description of a black male, between six feet and six feet three inches tall, mid-twenties to late-thirties, heavy build, darker than normal complexion, clean shaven, hair short on top with shaved sides, wearing a knit, collared, dark shirt over a white undershirt, and dark-colored long pants. The man was about fifty feet away, but looked right at Matias. In contrast, although McDuffie was in his late thirties, he was five feet seven inches tall, wearing a dark shirt and tan pants while working in the store that night.
When McDuffie was arrested on December 17, 2002, Matias saw his picture on television and believed McDuffie was the man he saw that night at the Dollar General. However, it was not until April 2003 that he told a Sheriff's investigator that he thought the man he saw on television was the same man he saw October 25, 2002, at the Dollar General. Based on information given to him by the investigator, Matias wrote a letter requesting the $10,000 reward offered by Dollar General. Matias agreed that it was likely that if he did not come to court and identify McDuffie, he would not get the reward. He did receive the reward, however, prior to the time of the trial.
Sheriff's investigators interviewed McDuffie in the early morning hours after the murders were discovered and again some days later. McDuffie told investigators he left the store that night shortly after Carol Hopkins left. He said that he and his wife drove approximately forty-five minutes to an Aaron's home furnishing rental center to put Troy's money order payment in the night drop box. He said they arrived about 9:35 p.m. and then drove to a nearby McDonald's for some food. McDuffie estimated he arrived home by about 10:15 p.m., but the evidence established that he could not have reached Aaron's before 10:30 p.m. A videotape taken at McDonald's showed McDuffie buying his food there at 10:34 p.m.
The only physical evidence linking McDuffie to the crimes was a partial palm print matching the upper portion of McDuffie's right hand, which was found on a reconstructed strip of Dollar General duct tape taken from around Beauregard's wrists. The State's latent print examiner testified that a palm print could, under certain circumstances, be transferred from one portion of duct tape to another if the tape was pressed together. This was one hypothesis offered by the defense for how *319 the print could have been located where it was on the tape.
Evidence found at the scene also included: a box cutter blade with both victims' blood found wrapped in bloody paper towels (Schneider's blood) stuffed into Schneider's purse; unidentified hair found in the same bloody paper towels; bloody scissors found on the floor under and between Schneider and Beauregard; a bloody screwdriver found in the office; a cardboard box by the office door with Schneider's blood on it; another pair of scissors with the victims' blood found on the desk; and unidentified female blood found on the inside handle of the restroom door and on the floor of the restroom.
No hair, fiber, or DNA connected McDuffie to the crime. A Pepsi bottle near the office had McDuffie's DNA on it but no evidence indicated when McDuffie drank the soda or placed the bottle there. The bullets that killed Schneider and Beauregard were .22 caliber subsonic sniper-type rifle bullets that can also be fired from a handgun, but the gun was never found and there was no evidence linking McDuffie to a gun.
A substantial portion of the State's case was devoted to establishing a motive by showing the dire financial condition in which McDuffie found himself in September and October 2002. This evidence included these facts: McDuffie's car had been repossessed; he had been unemployed for a month; he had been evicted from his rented residence; he owed back rent, current rent and a security deposit; and he was being dunned by creditors. The State produced evidence that early on Saturday, October 26, McDuffie purchased three money orders totaling $1,450, which were later given to his new landlord for the rent and the security deposit due on McDuffie's new rental residence.
McDuffie testified in his own defense that he left the store shortly after Carol Hopkins and had nothing to do with the crimes. The defense crime scene reconstruction expert testified that based on the number of weapons, the two open rolls of paper towels found in the storeroom, the differing wounds inflicted, the difficulty of handling two victims and binding one with duct tape, and the unidentified hair and female blood found at the scene, it was likely that there were two perpetrators. The defense also presented the testimony of jail inmate Kevin Ingram who said another inmate, Michael Fitzgerald, a white male, had confessed to involvement in the crimes. Michael Fitzgerald testified, denying involvement in the crimes and claiming that while he was in jail he heard McDuffie confess to the crimes.
The jury found McDuffie guilty of the first-degree murders of Janice Schneider and Dawniell Beauregard, robbery with a firearm, and false imprisonment with a firearm. The case proceeded to the penalty phase after which the trial court sentenced McDuffie to death for each of the murders. McDuffie was also sentenced to life in prison for his conviction of robbery with a firearm and to a term of fifteen years for his conviction of false imprisonment while armed.

ISSUES ON APPEAL
McDuffie raises ten issues on appeal.[1] We discuss three of these issues in detail  *320 the exclusion of Wiggins' testimony, the limitation on cross-examination of witnesses Matias and Hopkins, and the Pederson voice mail testimony. We do so because we conclude that the trial court's rulings on these issues constitute reversible error in the guilt phase. We also discuss sufficiency of the evidence.

Defense Richardson Violation
McDuffie's first issue on appeal is his claim that the trial court erred in excluding the testimony of defense witness Wiggins based on a Richardson violation committed by the defense. The defense called McDuffie's friend, Anthony Wiggins, to testify during the guilt phase that Wiggins had, in the weeks before the murders, sent McDuffie two Western Union money transfers totaling $340. McDuffie and his wife had testified that a number of individuals loaned or gave them money in mid-October, which could account for some of the cash McDuffie had on the day after the murders and help rebut the State's contention that McDuffie was desperate over his poor financial condition. Wiggins was the only non-family member who could testify that he loaned money to McDuffie in October.
The State objected to Wiggins' testimony because he had been listed only as a penalty-phase witness and not as a guilt-phase witness, and because the defense had just that morning produced Wiggins' $40 Western Union transfer receipt dated October 18, 2002, which the State had not had time to explore or verify. Defense counsel explained that Wiggins was inadvertently listed only for the penalty phase and that Wiggins had just given counsel the $40 Western Union receipt that day. Defense counsel offered to call Wiggins later or the next day.
The prosecutor responded: "I mean, I'm totally unaware of what this person is going to say and I'm sure that I can probably deal with it at this point in time. But the problem is it is a surprise." (Emphasis added.) The trial court announced that the defense had committed a Richardson discovery violation which prejudiced the State and that Wiggins' testimony would be excluded.
On proffer, Wiggins, a barber, testified that he had been a friend of McDuffie for nine or ten years and used to cut his hair in Jacksonville. Wiggins said he wired $40, for which he had a Western Union transfer receipt, to McDuffie on October 18, 2002. He testified that he also loaned McDuffie $300 via Western Union earlier that same week, for which he did not have a receipt.
The court, finding that a Richardson violation had occurred and concluding that the State was prejudiced, excluded both the Western Union receipt and Wiggins' testimony without exploring any alternatives, *321 such as a short delay for a deposition, a continuance, or presentation of the witness later in the week as suggested by the defense. Importantly, the State never specifically asked the court to exclude the witness, nor did the State request any lesser remedy, such as a short delay to depose Wiggins. During closing argument, the State stressed that the purported undocumented loans to McDuffie were from "just the family" and were not credible.
Where exclusion of evidence or other sanction is sought because of a discovery violation, Richardson holds that the trial court's discretion can be properly exercised only after an adequate inquiry is made into three areas: (1) whether the discovery violation was willful or inadvertent; (2) whether it was trivial or substantial; and (3) whether it had a prejudicial effect on the opposing party's trial preparation. 246 So.2d at 775. Prejudice in this context means procedural prejudice significantly affecting the opposing party's preparation for trial. See, e.g., Scipio v. State, 928 So.2d 1138, 1146 (Fla.2006). This Court will review the record to determine if this full inquiry was made and if the trial court's actions pursuant to the inquiry were proper. The same rules apply and the same procedure must be followed regardless of which party commits the discovery violation, but additional constitutional considerations are involved when a defense witness is excluded. This is because "[t]here are few rights more fundamental than the right of an accused to present witnesses in his or her own defense." Alexander v. State, 931 So.2d 946, 950 (Fla. 4th DCA) (quoting Jenkins v. State, 872 So.2d 388, 389 (Fla. 4th DCA 2004)) (alteration in original), review denied, 944 So.2d 988 (Fla.2006).
In this case, defense counsel explained that Wiggins' name had been inadvertently listed as only a penalty-phase witness and not as a guilt-phase witness. The trial court did not find the violation to be willful and never inquired into whether the violation was substantial or trivial. The trial court made only a limited inquiry into whether the violation prejudicially affected the State's ability to prepare for trial. Here, the State, as the aggrieved party, failed to assert that it would suffer any substantial procedural prejudice if Wiggins were allowed to testify. Instead, the prosecutor tempered his mild claim of prejudice by stating, "I'm sure that I can probably deal with it at this point in time. But the problem is it is a surprise." Notwithstanding that concession, the trial court immediately excluded Wiggins' testimony and evidence without exploring what substantial procedural prejudice would accrue to the State if he testified.
We are mindful that Florida Rule of Criminal Procedure 3.220(n)(1) authorizes a trial court to exclude evidence as a sanction for a violation of the discovery rules, but this sanction should only be imposed when there is no other adequate remedy. Furthermore, where as here the violation has not been found to be willful or blatant, this sanction is generally too severe "when the only prejudice to the State is its inability to obtain evidence for impeachment of the witness." Grace v. State, 832 So.2d 224, 227 (Fla. 2d DCA 2002); cf. Taylor v. Illinois, 484 U.S. 400, 415, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (holding that if the failure to disclose a defense witness was "willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness's testimony"). In this case, the trial court did not make a finding that *322 the defense discovery violation was willful or intended to gain a tactical advantage, but the court excluded otherwise admissible evidence based on the State's surprise and asserted difficulty in obtaining evidence with which to impeach Wiggins. Even if the inability to obtain impeachment evidence by the State were considered a substantial procedural prejudice, the trial court's required inquiry does not stop there.
"First, the judge must decide whether the discovery violation prevented the aggrieved party from properly preparing for trial. Second, the judge must determine the appropriate sanction to invoke for the violation." Smith v. State, 372 So.2d 86, 88 (Fla.1979); see also Snelgrove v. State, 921 So.2d 560, 567 (Fla.2005) ("Richardson mandates that once a discovery violation is revealed, the trial court must conduct an inquiry to determine the sanctions that should be imposed on the violating party.").
Where the issue involves possible exclusion of defense evidence, the "extreme sanction of excluding [defense] evidence . . . should be used only as a last resort" and "it is incumbent upon the trial court . . . to determine whether any other reasonable alternatives can be employed to overcome . . . possible prejudice," including declaration of a mistrial. Casseus v. State, 902 So.2d 294, 295 (Fla. 4th DCA 2005) (quoting State v. Eaton, 868 So.2d 650, 653 (Fla. 2d DCA 2004)); see also Tomengo v. State, 864 So.2d 525, 530 (Fla. 5th DCA 2004) (stating that exclusion of a defense witness because of a defense disclosure violation is a severe sanction that should be a last resort reserved for extreme or aggravated circumstances); Livigni v. State, 725 So.2d 1150, 1151 (Fla. 2d DCA 1998) (stating that the severe sanction of defense witness exclusion for witness list violation should be a last resort reserved for extreme or aggravated circumstances).
When, as in this case, the discovery violation is committed by the defense, special importance attaches to the trial court's inquiry into alternative sanctions because exclusion of exculpatory evidence implicates the defendant's constitutional right to defend himself or herself. See Alexander, 931 So.2d at 950; see also McBride v. State, 913 So.2d 696, 699 (Fla. 1st DCA 2005) (holding that a criminal defendant has a due process right to present evidence and that exclusion of evidence for a defense discovery violation should be imposed only if no other remedy suffices). In this case, the trial court did not consider whether another course of action could remedy or mitigate any procedural prejudice to the State, even though the defense offered to call the witness later. The trial court could have allowed a brief delay for a deposition or Wiggins' testimony could have been postponed until the end of the defense case.
Accordingly, we conclude that the trial court erred when it failed to conduct an adequate Richardson inquiry and excluded the testimony of the defense witness without considering less extreme alternatives. The failure to consider less extreme alternatives is of even greater significance here because the prosecutor actually stated that he could deal with the witness. Although we no longer adhere to a strict standard of per se reversible error and a harmless error analysis is proper, Scipio, 928 So.2d at 1146, we will analyze this error cumulatively with the other errors that we conclude also occurred.

Restrictions on Cross-Examination
McDuffie's second issue on appeal relates to the trial court's restriction on cross-examination of witnesses Carol Hopkins and Alex Matias concerning photographs *323 of two men, Steve Absalon and Michael Fitzgerald, who resembled the two men sitting outside the store at closing. Carol Hopkins, the last cashier to leave the store that evening, reported that two "suspicious" men were sitting outside the Dollar General when she left. She assisted investigators in preparing composite drawings of the men. The defense attempted to cross-examine Hopkins concerning a photograph of Absalon, a black male who resembled McDuffie and had a prior association with the same shopping plaza in which the Dollar General is located. Hopkins testified on proffer that she was "fairly certain" that the photograph of Absalon depicted the black male who was sitting with a white male outside the Dollar General.
The defense also attempted to cross-examine Hopkins concerning a photograph of Fitzgerald. She testified on proffer that the man in the photograph looked like the white male who was also sitting on the bench outside the Dollar General. Jail inmate Kevin Ingram later testified that Fitzgerald had confessed to being involved in the Dollar General crimes. Evidence also established that Fitzgerald used to date Dawniell Beauregard's sister, Tammy, and is the father of her two children. He had been to the Dollar General store in the past when Beauregard was working there as a cashier. Fitzgerald testified that on the night of October 25, 2002, he had ridden in a dark blue car with two black males and had been buying and smoking crack cocaine. He admitted lying to police concerning his whereabouts that night when questioned about an unrelated incident because, he said, he did not want the police to know he had been smoking crack cocaine. At the time he testified, Fitzgerald was in prison for armed robbery.
The defense attempted, unsuccessfully, to cross-examine Alex Matias about Absalon's photograph. Matias testified for the State that he saw a black male leaving and re-entering the Dollar General about 9:27 p.m. on the night of the murders. Matias assisted investigators in preparing a composite drawing of the man he saw that night, but portions of the face in the drawing were left blank. He described the man as being in his mid-twenties to late-thirties, over six feet tall, and wearing a dark shirt and dark-colored pants. (McDuffie was thirty-nine years old, approximately five feet seven inches tall, and was wearing tan pants that night.) In December 2002, Matias saw a photograph of McDuffie on television news and believed him to be the man he saw at the Dollar General on October 25. Matias did not report this information to law enforcement officers until April and he collected a $10,000 reward for his information in July 2003.
The State argues that the restriction upon cross-examination concerning the photographs of Absalon and Fitzgerald was proper because the trial court had previously ruled that the defense could not present reverse Williams rule evidence that Absalon had committed an armed robbery in the same shopping plaza and that Fitzgerald had committed several armed robberies.[2] The trial court ruled *324 that the defense could not present, as reverse Williams rule evidence, the fact that in June 2003 Michael Fitzgerald committed several robberies of convenience stores that were open for business by displaying but not discharging a firearm, because the facts of those robberies were not sufficiently similar to the crimes for which McDuffie was on trial. For this same reason, the trial court also ruled that the defense could not present evidence that Steve Absalon and an accomplice, while wearing masks and displaying but not discharging a firearm, had previously robbed a bank in the same shopping plaza where the Dollar General is located. The trial court concluded that evidence of the crimes committed by Fitzgerald and Absalon was inadmissible as reverse Williams rule evidence because it was not of such nature that it would be admissible if either of those people were on trial for the present offenses. See State v. Savino, 567 So.2d 892, 894 (Fla.1990) ("If a defendant's purpose is to shift suspicion from himself to another person, evidence of past criminal conduct of that other person should be of such nature that it would be admissible if that person were on trial for the present offense."). We conclude that the trial court did not err in prohibiting the presentation of this reverse Williams rule evidence because the prerequisites for reverse Williams rule evidence were not present. However, the inadmissibility of evidence for one purpose  here, as reverse Williams rule evidence  does not dictate inadmissibility for another proper purpose, specifically cross-examination. See § 90.107, Fla. Stat. (2005); Consalvo v. State, 697 So.2d 805, 813 (Fla.1996).
We begin with the premise that limitation on cross-examination of witnesses is reviewed for abuse of discretion. Boyd v. State, 910 So.2d 167, 185 (Fla. 2005). A trial court's discretion in this area, however, is constrained by the rules of evidence, Johnston v. State, 863 So.2d 271, 278 (Fla.2003), and by recognition of a criminal defendant's Sixth Amendment rights. "The right of a criminal defendant to cross-examine adverse witnesses is derived from the Sixth Amendment and due process right to confront one's accusers. One accused of crime therefore has an absolute right to full and fair cross-examination." Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982). As the United States Supreme Court explained in Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974):
Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.
The scope of cross-examination is not without bounds, but "where a criminal defendant in a capital case, while exercising his sixth amendment right to confront and cross-examine the witnesses against him, inquires of a key prosecution witness regarding matters which are both germane to that witness's testimony on direct examination and plausibly relevant to the defense, an abuse of discretion by the trial *325 judge in curtailing that inquiry may easily constitute reversible error." Coxwell v. State, 361 So.2d 148, 152 (Fla.1978). In this case, the proffered cross-examination of both Matias and Hopkins constituted legitimate inquiry into matters both germane to their direct testimony and plausibly relevant to the defense's theory in which McDuffie was attempting to show that Matias's identification of McDuffie was faulty.
We have long recognized the right of a defendant in a capital case to fully cross-examine those witnesses called by the prosecution:
It is too well settled to need citation of authority that a fair and full cross-examination of a witness upon the subjects opened by the direct examination is an absolute right, as distinguished from a privilege, which must always be accorded to the person against whom the witness is called and this is particularly true in a criminal case such as this wherein the defendant is charged with the crime of murder in the first degree. For the sake of emphasis we make the observation that at the time of the proposed cross-examination appellant stood in jeopardy of being convicted of such capital offense. Cross-examination of a witness upon the subjects covered in his direct examination is an invaluable right and when it is denied to him it cannot be said that such ruling does not constitute harmful and fatal error. Moreover, the right of cross-examination stems from the constitutional guaranty that an accused person shall have the right to be confronted by his accusers.
Coco v. State, 62 So.2d 892, 894-95 (Fla. 1953). "[C]ross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief. . . ." Boyd, 910 So.2d at 185 (quoting Coco, 62 So.2d at 895).
The proffered cross-examination of Hopkins was directly related to her testimony on direct examination about two men she saw sitting outside the store that night. She further testified on cross-examination that she was so concerned about their presence that, as she was leaving, she told her co-workers to call 911 if anything happened to her on the way to her car. She testified during her proffer that she was "fairly certain" the photograph of Absalon depicted one of the men she saw sitting on the bench after closing time at the Dollar General. The photograph of Fitzgerald, a man with known ties to the shopping plaza and to Beauregard, closely resembled the composite drawing of the white male which Hopkins helped create. Cross-examination concerning photographs of these two men, one whose face resembled McDuffie's and one who was said to have confessed to involvement in the crimes, was both within the scope of direct-examination of Hopkins and relevant to McDuffie's theory of defense, including the theory that Matias misidentified McDuffie as the man he saw that night leaving and re-entering the Dollar General.
Cross-examination of Matias concerning the photograph of Absalon was also relevant to Matias's testimony identifying McDuffie. Matias's contemporaneous description of the man he saw that night varied substantially from McDuffie's physical description, and Matias was never confronted with a photographic or live line-up from which to identify any suspect as the person he saw at the Dollar General. The face of the composite that was prepared based on Matias's description was left incomplete due to Matias's inability to find composite components that matched his recollection of the man. His sole exposure *326 to possible suspects was by way of the televised photograph of McDuffie who, at the time, was already under arrest for the crimes.
We have long held that it is "fatal error for the trial court to deny defense counsel the right of cross-examination for the purpose of laying a predicate for impeachment." See Coco, 62 So.2d at 896. Here, cross-examination of Matias with a photograph of a man who Carol Hopkins was "fairly certain" was sitting on the bench outside the store at closing time on the night of the crimes could have formed the basis for impeaching or testing the accuracy of Matias's identification of McDuffie. Therefore, cross-examination of Matias regarding the Absalon photograph was relevant to the credibility of his in-court identification of McDuffie as the man he saw at the Dollar General and was relevant to McDuffie's theory of defense.
Our review of the record convinces us that the trial court abused its discretion in restricting cross-examination in these areas, and in so doing committed error. Although this error standing alone might be considered harmless (although the State has not argued that it is harmless), we conclude that this error should be considered cumulatively with the other errors we have identified and considered in light of the remaining evidence, which was largely circumstantial.

Voice Mail Evidence
Next, McDuffie contends that the trial court committed reversible error when it admitted testimony of the detailed contents of a threatening and vulgar message McDuffie left on the voice mail of attorney David Pederson on October 22, 2002. Pederson, an attorney whose father had previously rented a home to the McDuffies, had filed an eviction suit against McDuffie in which he claimed back rent and fees, including attorney's fees. The voice mail was left after McDuffie received the eviction suit. The actual voice mail was subsequently erased but Pederson was allowed to testify, over defense objection, as to the contents of the message:
He said that he hoped myself and my father would go to Baltimore, Maryland, and get our asses shot off. At that time the sniper was there. Also, he said you can go suck your father's dick, fuck your mother, things along that nature. It's just  it was a nasty, hardcore message.
The trial court admitted this detailed testimony based on the State's argument that it showed McDuffie's state of mind and desperation over his financial situation. We hold that admission of the contents of the voice mail message was error.
The standard of review of a trial court's evidentiary rulings is abuse of discretion. Fitzpatrick v. State, 900 So.2d 495, 514-15 (Fla.2005). The trial court's discretion is limited, however, by the rules of evidence, Johnston, 863 So.2d at 278, and by the principles of stare decisis. Cf. Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) ("Judges dealing with cases essentially alike should reach the same result."). A trial court also abuses its discretion if its ruling is based on an "erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). We will, therefore, examine the rules of evidence which govern and the assessment of the evidence presented in this case.
Section 90.402, Florida Statutes (2005), a provision within the Florida Evidence Code, provides that all relevant evidence is admissible except as provided by law. "Relevant evidence is defined as `evidence tending to prove or disprove a *327 material fact' [but] . . . `[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.'" Sliney v. State, 944 So.2d 270, 286 (Fla.2006) (quoting §§ 90.401, 90.403, Fla. Stat.). "[P]roper application of section 90.403 requires a balancing test by the trial judge. Only when the unfair prejudice substantially outweighs the probative value of the evidence must the evidence be excluded." Alston v. State, 723 So.2d 148, 156 (Fla.1998).
"Unfair prejudice" has been described as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Brown v. State, 719 So.2d 882, 885 (Fla.1998) (quoting Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)). This rule of exclusion "is directed at evidence which inflames the jury or appeals improperly to the jury's emotions." Steverson v. State, 695 So.2d 687, 688-89 (Fla.1997). In performing the balancing test to determine if the unfair prejudice outweighs the probative value of the evidence, the trial court should consider the need for the evidence, the tendency of the evidence to suggest an emotional basis for the verdict, the chain of inference from the evidence necessary to establish the material fact, and the effectiveness of a limiting instruction. Taylor v. State, 855 So.2d 1, 22 (Fla.2003). The trial court is obligated to exclude evidence in which unfair prejudice outweighs the probative value in order to avoid the danger that a jury will convict a defendant based upon reasons other than evidence establishing his guilt.
The Second District's decision in Coverdale v. State, 940 So.2d 558 (Fla. 2d DCA 2006), is a case in point. Coverdale involved a prosecution for aggravated stalking, in which the trial court admitted evidence that Coverdale threatened a detective, saying he was going to hunt her down and would like to see her head blown off. Id. at 561. The prosecution argued the threatening statement was probative of Coverdale's state of mind concerning the crime of stalking the victim in the case. Id. The Second District reversed, explaining that
[the detective's] testimony that Coverdale was acting irate do[es] address Coverdale's state of mind. But, the additional testimony about Coverdale's threat to hunt down the detective and that she would look good with a bullet in her head or that it would be nice to see her head blown off was unduly prejudicial. Thus, the trial court abused its discretion in allowing the testimony.
Id. at 562.
In Davis v. State, 718 So.2d 874 (Fla. 5th DCA 1998), in a prosecution for exploitation of the elderly, the trial court admitted a videotaped interview with the victim that was marginally relevant to show the victim's state of mind to corroborate her incompetence. Id. at 876. The district court reversed because the unfair prejudice to Davis outweighed the tape's probative value, noting that the tape's principal effect was to show the victim's loathing of the defendant and the attitude of the interviewer that the defendant was a threat. Id. at 877. The district court said that showing the marginally relevant tape "lobbed the proverbial skunk into the jury box, and deprived the defendant of a fair trial." Id.
Similar to Coverdale and Davis, in this case the details of the statement that McDuffie hoped Pederson and his father would go to Baltimore and "get [their] asses shot off" was unnecessary to prove what the State asserted was the relevant fact  that McDuffie was in a desperate *328 state of mind. The vulgar portion of the voice mail only showed that he was extremely irate at having been served with a suit for eviction claiming attorney's fees he thought were unconscionable. Nor were the details of the voice mail, which occurred days before the murder and bore no relationship to the crimes, probative of whether McDuffie committed robbery and murder. On the other hand, those details tended to prove quite effectively several irrelevant, highly prejudicial facts  that McDuffie was vicious, nasty, and of questionable moral character. In addition, the reference to the sniper incidents, which involved random shootings by black men of primarily white victims, could only serve to inflame the jury's emotions.[3]
We conclude that the trial court abused its discretion in admitting the detailed contents of the threatening and obscene voice mail. Any purported probative value is marginal at best as it simply shows McDuffie was angry over being evicted, a fact that did not require the objectionable details of the voice mail to prove. Any marginal probative value relative to McDuffie's state of mind is substantially outweighed by the highly inflammatory contents of a voice mail depicting McDuffie as a person with a vicious temper who wishes on another individual a fate similar to that of the victims of the Washington, D.C./Baltimore area snipers.
The trial court erred in admitting this evidence over McDuffie's objection. Improper admission of this evidence, over objection, is subject to a harmless error analysis as set forth in State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986); see also Floyd v. State, 913 So.2d 564, 573 (Fla. 2005). Because of the other errors that occurred, all of which were also preserved, we have determined that a cumulative harmless error analysis is appropriate.

Cumulative Error
Harmless error analysis places the burden upon the State, as beneficiary of the errors, to prove there is "no reasonable possibility that the error contributed to" McDuffie's conviction. DiGuilio, 491 So.2d at 1138. It is well-established that the harmless error test "is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test" but the "focus is on the effect of the error on the trier-of-fact." Id. at 1139.
Where multiple errors are discovered in the jury trial, a review of the cumulative effect of those errors is appropriate because "even though there was competent substantial evidence to support a verdict . . . and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors [may be] such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation." Brooks v. State, 918 So.2d 181, 202 (Fla.2005) (quoting Jackson v. State, 575 So.2d 181, 189 (Fla.1991)); accord Penalver v. State, 926 So.2d 1118, 1137 (Fla.2006).
Although this case was not entirely circumstantial, the evidence asserted by the State to be "direct evidence" was not unassailable. Matias's identification of McDuffie was potentially impeached by his receipt of the $10,000 reward, which he said he probably would not have received had he not identified McDuffie at trial. Matias's contemporaneous description of *329 the perpetrator did not match McDuffie in several important respects. The testimony offered by the jail inmates  Ingram claiming Fitzgerald confessed and Fitzgerald claiming McDuffie confessed  was less than compelling. Because the evidence was largely circumstantial, any defense evidence that would support McDuffie's hypothesis of innocence and rebut the State's evidence of motive would have been critical to the defense.
We conclude that the errors that occurred in this case, when viewed cumulatively, cannot be considered harmless beyond a reasonable doubt. By excluding defense witness Wiggins, the trial court deprived the defense of the only non-family member who could testify to the loans made to McDuffie. Further, the failure to allow full cross-examination of the witnesses who were actually on the scene at or near the times of the crimes prevented the defense from further casting doubt on the reliability of the Matias eyewitness identification. Lastly, the effect on the jury created by the violent and vulgar contents of the voice mail cannot be underestimated. With just two sentences, an image of McDuffie as a potentially violent human being capable of wishing death on another  one who is not even a victim in the case  emerged. For all these reasons, we conclude that the State cannot establish that the errors were harmless beyond a reasonable doubt.

Sufficiency of the Evidence
Finally, before reversing and remanding for a new trial we analyze the sufficiency of the evidence because if there is insufficient evidence on which to convict McDuffie of these murders, it is our obligation to reverse the convictions with directions to grant judgments of acquittal. The trial court denied the defense motions for judgment of acquittal made at the conclusion of the State's case-in-chief and at the conclusion of all the evidence. We must review the evidence to determine if either of these rulings was error. A de novo standard of review applies. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002).
In challenging the sufficiency of the evidence to support the verdicts in this case, McDuffie characterizes substantially all the evidence presented by the State as circumstantial, requiring the special standard of review applicable to wholly circumstantial cases. The State counters that the evidence cannot be considered wholly circumstantial because the "eyewitness" testimony of Matias placed McDuffie at the Dollar General at 9:27 p.m., which is inconsistent with McDuffie's testimony that he left the store before 9 p.m. The State also argues that McDuffie essentially waived the circumstantial nature of the case by calling Michael Fitzgerald to testify, during which Fitzgerald said that while in jail he heard McDuffie confess to the crimes. We have held, however, that if the State fails to present a prima facie case and the defendant makes a sufficient motion for judgment of acquittal at the close of the State's case, the issue of the sufficiency of the evidence at that point is not waived by later introduction by the defense of evidence which supplies the missing element. State v. Pennington, 534 So.2d 393, 395-96 (Fla.1988); see also Fla. R.Crim. P. 3.380(b). For this reason, we first review the evidence as it stood at the close of the State's case to determine if, at that time, the State had carried its burden of presenting sufficient evidence upon which the jury could convict McDuffie.
McDuffie contends that the State's evidence should be reviewed under the special standard applicable to wholly circumstantial cases, as set forth in Reynolds v. State, 934 So.2d 1128 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 943, 166 L.Ed.2d 721 (2007):

*330 "[W]here a conviction is based wholly upon circumstantial evidence, a special standard of review applies." Darling v. State, 808 So.2d 145, 155 (Fla.2002). As stated in Darling:

Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
Id. at 1145-46. However, even in a purely circumstantial case
[the court's] view of the evidence must be taken in the light most favorable to the state. The state is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
Orme v. State, 677 So.2d 258, 262 (Fla. 1996) (quoting State v. Law, 559 So.2d 187, 189 (Fla.1989)) (alterations in original). For purposes of our review, we will first consider the sufficiency of the State's evidence at the close of its case-in-chief as if wholly circumstantial, and will apply the special standard for such cases. We will then review the sufficiency of the evidence as it stood at the conclusion of the trial.

A. Sufficiency of the Evidence at Conclusion of the State's Case
We are aware that no physical evidence of hairs, fibers, or DNA was found to link McDuffie to the robbery and murders. The gun was never recovered. The money, checks and bank bag were never located. Although McDuffie's DNA was found on a Pepsi bottle sitting on a box that also bore a spot of Schneider's blood, no evidence indicated when the bottle was placed there, and the fact that McDuffie worked in the store all week militates against that DNA on the Pepsi bottle being probative of these crimes.
At the conclusion of the State's case-in-chief, evidence had been presented that McDuffie's palm print was found on the duct tape binding Beauregard's wrists. The duct tape was identical to that sold at the Dollar General store. The State presented no evidence as to when the print was placed there, but did submit forensic evidence that the print was in a location on the tape which the jury could reasonably find would not have resulted from McDuffie simply handling the roll of duct tape in the course of his employment. Marta Strawser, Florida Department of Law Enforcement senior crime lab microanalyst, testified that the cut and torn pieces of tape taken from Beauregard's hands were microscopically reconstructed into a continuous strip. Ms. Strawser found that McDuffie's palm print was located no closer than thirty inches to one end of the reconstructed strip and forty-one inches from the other. The rolls of duct tape sold at Dollar General were at most seventeen inches in circumference. The State's latent fingerprint specialist did concede, however, that a print can be transferred from one location on a piece of tape to another when the tape is pressed together, as it had been in this case.
The State also presented the testimony of Alex Matias. He identified McDuffie as the man he saw going into and out of the *331 Dollar General around 9:27 p.m. on the night of the murders. This was important testimony because McDuffie had previously told investigators that he left the store around 8:45 p.m. and drove directly to the Aaron's rental center to make a payment in the drop-off box, a trip that takes about forty minutes. A videotape of the Aaron's rental center driveway shows no cars entering between 9:10 p.m. and 10:30 p.m., when headlights are first seen. McDuffie also told investigators that he proceeded directly from Aaron's to a nearby McDonald's restaurant and was there about 9:35 p.m. However, a videotape from the McDonald's that night showed McDuffie inside McDonald's at 10:34 p.m. This evidence was sufficient to support the jury's rejection of McDuffie's reported timeline of events that evening and to rebut the suggestion of a reasonable hypothesis of innocence that the defense sought to establish during the State's case-in-chief.
The State also presented evidence demonstrating that McDuffie had serious financial troubles, which the State argued provided a motive for the crimes. McDuffie had recently been evicted and had to rent a new home; he owed back rent, current rent and fees; he had been unemployed for a period of time; and one of his cars had been repossessed. The jury heard that on October 23, 2002, McDuffie advised his new landlord that he did not have the $1,450 that was due, but would have it soon. The landlord picked up the rent and security deposit from McDuffie's home on October 27, 2002. The payment of $1,450 was in the form of three money orders that McDuffie purchased early on October 26, 2002, the day after the crimes.
Even if this case were entirely circumstantial, the State would not be required to rebut every possible variation of events, but must only present evidence inconsistent with the defendant's reasonable hypothesis of innocence. Delgado v. State, 948 So.2d 681, 690 (Fla.2006). We conclude that the State met its threshold burden of presenting evidence during its case-in-chief which is sufficiently inconsistent with McDuffie's version of events, and with the hypothesis of innocence suggested by the defense during the State's case-in-chief, to create a jury question. See Law, 559 So.2d at 188-89. Because the State presented prima facie evidence of inconsistency as to McDuffie's theory of events in its case-in-chief, "the question is for the finder of fact to resolve." Orme, 677 So.2d at 262. Therefore, the trial court did not err in denying the motion for judgment of acquittal made at the conclusion of the State's case-in-chief.

B. Sufficiency of the Evidence at Conclusion of the Defense's Case
McDuffie presented evidence during the defense's case in an attempt to rebut the inconsistencies disclosed by the State's evidence and to further attempt to prove his reasonable hypothesis of innocence. We will review the sufficiency of the evidence as it stood after the defense presented its case to determine if, at that point, the trial court erred in denying the renewed motion for judgment of acquittal.
McDuffie testified in his own defense, denying commission of the crimes and insisting that he left the store shortly after Carol Hopkins. He explained the inconsistency in the timeline by testifying that traffic and road construction must have caused his trip to take longer than expected that night. He demonstrated for the jury his hypothesis of how his palm print could have been placed innocently on the duct tape while he handled the tape that day helping a customer tape up some boxes. He presented evidence of money innocently received in October to account for the money he had shortly after the murders. *332 His expert testified that the number of weapons used in the crimes, the difficulty of one man handling two victims, and the unidentified blood and hair on the scene pointed to two perpetrators, not one.
The defense also presented jail inmate Kevin Ingram, who testified that another inmate, Michael Fitzgerald, had confessed that Fitzgerald and a black male (not McDuffie) were responsible for the robbery and that the black male had "taken care of" the employees at the Dollar General after Fitzgerald left the store with the money. The defense, however, also presented the testimony of jail inmate Michael Fitzgerald who, during cross-examination, denied involvement in the crimes and said that while in jail he heard McDuffie confess to the murders. At this point, direct evidence was presented upon which the jury could find McDuffie guilty.
Appellate courts review the denial of a motion for judgment of acquittal under the de novo standard, and must consider the evidence and all reasonable inferences from the evidence in a light most favorable to the State. Fitzpatrick, 900 So.2d at 507. Where the State has presented competent, substantial evidence of the crimes charged, the trial court does not err in denying a motion for judgment of acquittal and submitting the case to the jury. Conde v. State, 860 So.2d 930, 943 (Fla.2003). We conclude that the totality of the evidence, including evidence elicited in the defense's case, was sufficient to overcome the motion for judgment of acquittal made at the conclusion of all the evidence and to support the verdicts of the jury.

CONCLUSION
Although we find the evidence sufficient to support the verdicts in this case, as we explained above, the harmless error test is not a sufficiency-of-the-evidence test. The ultimate question is "whether there is a reasonable possibility that the error affected the verdict." DiGuilio, 491 So.2d at 1139. Notwithstanding the sufficiency of the evidence, we have concluded that cumulative error occurred that is not harmless beyond a reasonable doubt, thereby necessitating a new trial.
Accordingly, for the reasons stated in this opinion, we reverse McDuffie's convictions and sentences and remand for a new trial.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The claims on appeal are: (1) the trial court erred in failing to conduct an adequate inquiry under Richardson v. State, 246 So.2d 771 (Fla.1971), regarding a defense discovery violation and by excluding witness Wiggins' testimony and exhibit; (2) the trial court erred in denying the motion to suppress identification of McDuffie by Alex Matias and in restricting cross-examination of Matias and Carol Hopkins; (3) the trial court erred in restricting presentation of "reverse Williams rule" evidence (Williams v. State, 110 So.2d 654 (Fla. 1959)); (4) the trial court erred in admitting testimony of witness Pederson concerning a voice mail message; (5) the trial court erred in admitting evidence of collateral bad acts that became a feature of the trial; (6) the evidence is insufficient to support McDuffie's convictions; (7) the evidence is insufficient to support the finding of the "heinous, atrocious or cruel" (HAC) aggravator as to both murders; (8) Florida's capital sentencing statute and standard jury instructions violate the Fifth, Sixth, Eighth, and Fourteenth Amendments by establishing a presumption that death is the appropriate penalty and by shifting the burden of proof to the defendant to establish mitigating factors and to show that mitigation outweighs aggravation; (9) error occurred in the penalty phase because the jury heard argument and instruction regarding the "cold, calculated and premeditated" (CCP) aggravator which the trial court later rejected; and (10) Florida's capital sentencing statute violates the Sixth Amendment right to a jury trial under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[2] The "Williams rule" takes its name from Williams v. State, 110 So.2d 654 (Fla.1959), and is codified at section 90.404(2), Florida Statutes (2005). This rule allows introduction of similar fact evidence of other crimes or acts by the defendant that are relevant to prove a material matter in the prosecution. "Reverse Williams rule" evidence is evidence of a crime committed by another person that a defendant offers to show his or her innocence of the instant crime. See Rivera v. State, 561 So.2d 536, 539 (Fla.1990). The defendant must demonstrate a "close similarity of facts, a unique or `fingerprint' type of information" for the reverse Williams rule evidence to be admissible. White v. State, 817 So.2d 799, 806 (Fla.2002) (quoting State v. Savino, 567 So.2d 892, 894 (Fla.1990)). Exclusion of reverse Williams rule evidence is subject to abuse of discretion review. Huggins v. State, 889 So.2d 743, 761 (Fla.2004).
[3] The sniper attacks occurred in the Washington, D.C., Virginia, and Maryland area during the period September 5, 2002, to October 22, 2002. See Muhammad v. Commonwealth, 269 Va. 451, 619 S.E.2d 16, 24 (2005).