CIKLIN, J.
Christopher Carlisle appeals his conviction for sexual battery on a child while in a position of familial or custodial authority. Carlisle argues the trial court improperly restricted his ability to cross-examine the victim regarding her recantation of previous sexual abuse allegations against Car- *481 lisle. Because the trial court erred and the error was not harmless, we must reverse and remand for a new trial.
Facts
Carlisle and his wife adopted the victim and the victim’s younger brother when the children were very young. In 2005, when the victim was eleven, the victim told a therapist that Carlisle had inappropriately touched her. The police became involved and Carlisle was ordered to leave the home. About three to four months after initially accusing Carlisle, the victim recanted her accusations. Carlisle was then allowed to return to the family’s home.
In 2008, the victim told Mends that Car-lisle had again touched her inappropriately. The police again became involved, and the victim told the police that Carlisle touched her inappropriately once in January 2008 and again in March 2008. The victim stated that in one of the incidents, the victim awoke and saw Carlisle standing near her bed. Carlisle then digitally penetrated the victim. In the other incident, the victim awoke to find Carlisle kneeling beside her bed. Carlisle removed the victim’s pants and performed oral sex on her.
At the request of the police, the victim made two controlled calls to Carlisle, during which Carlisle made potentially incriminating statements.
Thereupon, the state charged Carlisle with one count of sexual battery on a child twelve years of age or older but younger than eighteen by a person in familial or custodial authority for the abuse occurring in 2008, and one count of lewd or lascivious molestation on a child younger than twelve years of age for the earlier incident of abuse that occurred in 2005.[1]
The state filed a pretrial motion in limine to preclude Carlisle from cross-examining the victim regarding her recantation of the 2005 abuse allegations. The state argued the false accusation was inadmissible under section 90.610, Florida Statutes (2007), and this court’s decision in Washington v. State, 985 So.2d 51 (Fla. 4th DCA 2008).[2] At a hearing on the motion, the victim testified she recanted the 2005 allegations because her adoptive mother ostracized the victim and isolated her from her siblings[3] after she made the allegations. Because of the negative atmosphere in her home, the victim told her therapist she fabricated the allegations in order to gain attention. The victim testified that at the time she made the 2005 allegations against Carlisle she was angry at him for punishing her after she used his credit card to purchase items over the internet. The victim also testified that the substance of her 2005 accusations against Carlisle were inconsistent; she initially accused Carlisle of touching her breasts, touching her private areas, performing oral sex on her, and making her touch his private areas. Later, the victim modified her accusations and stated Carlisle only touched her breasts and buttocks.
After the victim’s testimony was presented at the motion in limine hearing, the state argued the victim’s recantation was *482 inadmissible in a trial based on her accusation made three years after the recantation. Carlisle argued the recantation was admissible because it was made by the same victim against the same defendant under similar circumstances and because it was Williams rule evidence.[4] The trial court granted the state’s motion in limine and precluded Carlisle from cross-examining the victim as to her 2005 recantation.
At trial, the state’s case rested primarily on the victim’s testimony and the controlled calls. The victim offered testimony pertaining to the 2008 abuse allegations but not the 2005 allegations. During cross-examination, the victim testified Car-lisle was the main disciplinarian of the household and that Carlisle had recently punished the victim for stealing items from her siblings. The victim also stated she felt alienated because her adoptive parents favored their biological children.
Through the lead detective, the state introduced the controlled calls. In the first call, the victim asked Carlisle if he remembered “how like a couple years ago you told me, like, you pulled me out of the car and you told me that you would stop touching me?” Carlisle asked where the victim was and the victim answered that she was at a friend’s house. Carlisle asked if anyone else was in the room, and the victim answered that she was alone. The victim stated “Anyways, yeah, it’s just, it’s been on my mind a lot lately. So I just ...”, at which point Carlisle stated “It won’t, it won’t happen anymore.” The victim stated “I want you to stop touching my private parts, daddy,” and Carlisle answered “You got it, honey.” The victim asked “But do you love me as a daughter? ... Not as a girlfriend?”, and Carlisle answered that he loved her as a daughter and not as a girlfriend.
The victim then stated “Okay, I love you, but I don’t want you to get in trouble. You have to stop touching me.” Carlisle answered “I will.” The victim asked Car-lisle why he touched her, and Carlisle answered “I don’t know. I guess I get, get confused sometimes, honey. I’m sorry” and “I think sometimes I get confused, honey, I’m sorry. Sometimes I, you know, I’m lonely and I’m, you know .... ” The victim asked “Well, isn’t mom there for you?”, and Carlisle answered “Not usually.” The victim asked him to promise it would not happen again, and Carlisle stated “I promise you. I swear it will not happen again.”
After the first controlled phoné call, Carlisle called the house of the victim’s friend where the victim told Carlisle she was during the call. The victim then made a second controlled call to Carlisle. Car-lisle stated “I was just worried you weren’t put up to that call like somebody, like a police officer or something.” The victim answered that she was not, and asked why he was worried about that. Carlisle answered “Well, because I could get arrested and it would, it’d blow my life. I’d have to kill myself.” Carlisle stated “I appreciate you ... having the guts to, to come forward and talk to me about it.” The victim answered that it had been on her mind and bothering her. Carlisle then stated “I guess I thought you kind of enjoyed it, too, so.” Carlisle asked whose phone the vic *483 tim was calling from, and asked “The police aren’t coming to ... take me away?” The victim answered that they were not, and Carlisle stated “I’ll be more appropriate in the future.”
After the lead detective testified, the state rested. Outside the presence of the jury, Carlisle testified in a proffer to demonstrate why the victim’s recantation of the 2005 abuse allegations was relevant to explain his statements on the controlled calls. Carlisle testified that the experience of being falsely accused of sexual abuse and removed from his home was traumatic. Carlisle stated his fear of police involvement, evident on the controlled calls, stemmed from his fear of dealing with another fallacious accusation and being “thrown back in the system again.” Car-lisle testified that about three weeks before the victim made the controlled call, he had been “tickling” the victim and “pinched her butt.” During the tickling and pinching incident the victim called Carlisle a “pedophile.” Carlisle testified that when the victim made the controlled calls, he assumed she was talking about the tickling and pinching incident. Finally, Carlisle stated he was placating the victim on the calls because he “was trying to, to just go along with the flow and try and tell her what she needed to hear until I could get her off the phone and we could talk about this as a family.”
The trial court ruled that Carlisle could testify that he was falsely accused of sexual abuse in the past, but that he could not testify that the victim recanted her accusation. Carlisle testified in front of the jury, and repeated his explanations regarding the pinching incident to explain his statements on the controlled calls. Carlisle also offered explanations for his other statements on the calls. Carlisle testified his discussion of his relationship with his wife referred to the playfulness of the relationship and that when he said he thought the victim “enjoyed it too” he was referring to the tickling and pinching incident. Carlisle denied ever touching the victim’s vagina or otherwise touching her in a lewd manner. Carlisle also testified that when the victim made the 2008 allegations, she was facing punishment due to poor grades on her report card.
The victim’s younger brother testified that the victim told him she fabricated the 2008 allegations against Carlisle. The brother testified that the victim told him she could not recant her allegations because “she wouldn’t be able to live in the group home and she wouldn’t be able to have the scholarships, like be able to be supported.” The brother also testified that he slept in a bedroom across from the victim’s, that both of the children slept with their doors open, and that he never saw Carlisle inside the victim’s room late at night. On cross-examination, the brother admitted he had trouble remembering events when he was angry and that he had been angry when the victim told him the allegations were false.
The victim testified a second time as a rebuttal witness.- The victim denied telling her brother she lied about the abuse allegations. The victim testified she had told her brother that “sometimes I want to go back home” because the other girls at the group home were irritating.
The jury found Carlisle guilty and the court sentenced him to fifteen years in prison.
Pantoja v. State[5]
Carlisle contends the trial court reversibly erred by limiting his ability to cross-examine the victim regarding her prior recantation and by limiting his ability to *484 testify regarding the recantation. Carlisle further contends the evidence was admissible under sections 90.404(2) and 90.608(2), Florida Statutes, and that the trial court’s limitation of his ability to cross-examine the victim -violated the Confrontation Clause. The standard of review for the admissibility of evidence is abuse of discretion, limited by the rules of evidence. Washington, 985 So.2d at 52 (citation omitted). The standard of review for the trial court’s decisions regarding the scope and control of cross-examination is also abuse of discretion. See Medina v. State, 466 So.2d 1046, 1050 (Fla.1985) (citation omitted).
This case is controlled by Pantoja in which the Florida Supreme Court resolved the conflict between the Second District’s decision in daggers v. State, 536 So.2d 321 (Fla. 2d DCA 1988) and a First District case discussing cross-examination of a victim regarding prior false accusations.[6] Pantoja v. State, 59 So.3d 1092, 1094 (Fla.2011). The Pantoja court addressed the issue of whether the defendant was allowed to cross-examine a child sexual battery victim regarding a prior report of sexual molestation against a different person, which the child had recanted. Id. at 1095. In that case, the trial court prohibited the defendant from cross-examining the child regarding the past false allegation of abuse, which was in conflict with the Second District’s decision in Joggers. Id. at 1094-95.
The Court addressed the potential admissibility of the prior false accusation under section 90.608, Florida Statutes (showing the witness is biased), and the Confrontation Clause.[7] Id. at 1096-1100. A concurring opinion briefly discussed the application of section 90.404(2)(a) ('Williams rule evidence). Id. at 1100 (Pariente, J., concurring). The Court’s opinion on each of these issues was divided: Three justices concurred in the result and reasoning and two justices concurred only in the result. Id. at 1100-01.
Section 90.608(2) (Impeachment by Showing the Witness is Biased)
Pantoja addressed the admissibility of the false accusations under 90.608(2), which allows impeachment by “ ‘[sjhowing that the witness is biased.’ ” Id. at 1097 (quoting § 90.608(2), Fla. Stat. (2002)). The Court found that “the facts of Joggers did support the use of false reporting evidence to establish bias or motive pursuant to section 90.608(2),” but also concluded that the section did not apply to the facts of Pantoja. Id. The Court distinguished the Pantoja fact pattern from daggers under the following indicia: whether the pri- or allegations of abuse were against the *485 defendant or a different person,[8] the degree to which the current allegations of abuse and past allegations of abuse were similar, and whether the past allegations of abuse gave rise to a motive to lie in the current allegations. See id. Applying these factors to Pantoja’s appeal, the Court concluded the evidence was not admissible under 90.608(2) because the past allegations were not against Pantoja, the manner of abuse was different (the past abuse involved touching on the outside of the clothing, the later abuse involved physical and oral sexual acts under the clothing), and the past allegations indicated no motive to lie because no one believed or acted on the past allegations. See id.
Applying the Court’s discussion of section 90.608(2) to the instant case, we must conclude the trial court erred by prohibiting Carlisle from testifying regarding the recantation and from cross-examining the victim regarding her recanted allegations. The victim’s prior allegations of abuse were against Carlisle. The manner of abuse was similar (oral and digital contact with the victim’s vagina) — although the victim gave varying accounts of the older abuse incident. Finally, unlike Pantoja, the police acted on the victim’s past allegations of abuse and the victim therefore knew what effect her current allegations would have. This could conceivably support Carlisle’s allegations that the victim had a motive to lie about the abuse to gain attention or avoid punishment.
Confrontation Clause
The Court next addressed whether excluding the evidence of the past allegations violated the defendant’s rights to confront witnesses against him or his due process rights. Pantoja, 59 So.3d at 1098-1100. While “[sjeveral federal courts of appeals have concluded that there is no constitutional error in prohibiting cross-examination of a witness regarding an alleged false accusation against someone other than the defendant,” the Confrontation Clause requires that a defendant be allowed to cross-examine a witness regarding credibility “if that examination aims to reveal the motive, bias or prejudice of a witness/accuser.” Id. at 1099 (citations omitted). The Court noted that federal courts addressing similar issues apply the rule 403 balancing test[9] to exclude the evidence if it has minimal probative value but could cause unfair prejudice, confusion of the issues, or could mislead the jury. Id. at 1099-1100 (citations omitted). The Court concluded:
The trial court’s exclusion of the victim’s prior accusation does not result in a confrontation violation for several reasons. First, the victim’s prior accusation was against her uncle, not Pantoja. Second, the victim’s accusation against her uncle involved a one-time incident involving “over-the-clothes” groping, whereas her accusation [against Panto-ja] involves “under-the-clothes” sexual acts that occurred on multiple occasions. Third, the victim testified that she did not recant her prior accusation against her uncle. Finally, cross-examination regarding the victim’s prior accusation would not have explained her knowledge of sex to the jury and might have caused the jury to infer that she had a propensity to lie about sexual abuse.
Id. at 1100.
Applying the Court’s discussion of the Confrontation Clause to the instant case, *486 Carlisle’s constitutional rights were violated by prohibiting Carlisle from cross-examining the victim regarding the recanted allegations. The recanted allegations were against Carlisle, the manner of abuse was similar, and the victim admitted that she recanted the past allegations. Even with the risk that the jury may have erroneously considered the issue of the victim’s propensity to lie about sexual abuse, the exclusion of the evidence was nevertheless improper under the circumstances because the impeachment could have established that the victim had a motive to lie.
Section 90.404(2) (Reverse Williams Rule Evidence)
The evidence of the victim’s recantation was also admissible under section 90.404(2)(a), Florida Statutes (2007), as reverse Williams rule evidence. Justice Pariente noted in her concurring opinion that the evidence of recanted allegations of sexual abuse “might be admissible ... under section 90.404(2)(a).” Pantoja, 59 So.3d at 1100 (Pariente, J., concurring in result). The section provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
§ 90.404(2)(a), Fla. Stat. (2007).
For evidence to be admissible under section 90.404(2)(a), the evidence must have probative value to show a material fact, and the evidence is not admissible if its probative value is substantially outweighed by its unduly prejudicial nature. See McLean v. State, 934 So.2d 1248, 1255-56 (Fla.2006). In the instant case, the evidence of the prior recantation was relevant to show motive because it showed the specific reasons why the victim may have fabricated allegations of sexual abuse. When the victim recanted the allegations, she stated she made the allegations “for attention” and because she was angry that Carlisle had been upset with her. During trial, Carlisle attempted to show the victim fabricated the abuse allegations to avoid punishment by Carlisle, and the evidence of the prior allegations was relevant to show the victim knew what would happen if she once again made such allegations. The probative value of the recantation was not substantially outweighed by the risk of unfair prejudice.
Harmless Error
Finally, the state contends that even if the trial court erred by precluding testimony regarding the victim’s prior recantation, the error was harmless. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986) (“The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.”) (citation omitted).
We cannot say that precluding evidence of the prior recantation was harmless. The victim’s credibility was the central issue of the trial, and evidence that she recanted prior allegations of sexual abuse against Carlisle could have significantly weakened her credibility. See Woods v. State, 92 So.3d 890, 892 (Fla. 4th DCA 2012). Although Carlisle’s statements on the controlled calls appeared to have been highly incriminatory, Carlisle’s proffer indicated that evidence of the recantation might have lent support to his suggestion that his statements were only comments *487 pertaining to the so-called pinching and tickling incident.

Reversed and remanded.

STEVENSON and KLINGENSMITH, JJ., concur.

. Before trial, the state dropped the lewd or lascivious molestation count.

. In Washington, this court held that a victim testifying in an aggravated battery and carjacking case could not be impeached by evidence that the victim had filed a false police report in a totally unrelated matter when the victim was not convicted of any charges relating to the false report. Washington, 985 So.2d at 52. The court found the impeachment would be improper under 90.610 because that section allowed impeachment only by prior convictions. Id,

.After Carlisle and his wife adopted the victim and her brother, Carlisle’s wife gave birth to triplets.

. "Collateral crimes evidence includes similar fact evidence, which is governed by section 90.404, Florida Statutes, and is commonly referred to as ‘Williams rule evidence.’ ” Pulcini v. State, 41 So.3d 338, 344 (Fla. 4th DCA 2010) (citing Williams v. State, 110 So.2d 654 (Fla.1959)). " 'Reverse Williams rule’ evidence” refers to evidence of other crimes, wrongs, or acts by a person other than the defendant “that a defendant offers to show his or her innocence of the instant crime.” McDuffie v. State, 970 So.2d 312, 323 n. 2 (Fla.2007) (citation omitted).

. 59 So.3d 1092 (Fla.2011).

. We note that the Florida Supreme Court did not issue Pantoja until after the trial occurred in this case and thus the trial court did not have the benefit of Pantoja when it decided this issue.

. The Court also discussed the potential admissibility of the prior recantation under sections 90.610 and 90.405(2), Florida Statutes. The Court rejected the concept that a general false reporting exception existed under section 90.610, and the Court found that a false report was only admissible under this section if the person who made the false report was convicted of a felony or a misdemeanor involving dishonesty or false statement. Id. at 1096-97. The Court also found the recantation would be inadmissible under section 90.405(2) because the victim’s character is not an element or defense of the crime of sexual battery. Id. at 1097. Neither of these sections would be a basis for finding evidence of the victim’s recantation admissible in the instant case. While the state was correct that the evidence was not admissible under section 90.610, that section specifically notes that ”[n]othing in this section affects the admissibility of evidence under s. 90.404 or 90.608.” § 90.610(3), Fla. Stat. (2007).

. As then Chief Justice Canady pointed out in a dissenting opinion, in Jaggers the past abuse allegations were not against the same person as the later allegations. Id. at 1101 (Canady, C.J., dissenting). However, the Pantoja plurality opinion mentioned this as an important factor.

. Florida’s equivalent is found in section 90.403, Florida Statutes (2007).