DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PEDRO FAJARDO,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D14-3770

[ June 8, 2016 ]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Lisa M. Porter, Judge; L.T. Case No. 12-17953 CF10A.

Roberto D. Stanziale of Roberto D. Stanziale, P.A., Fort Lauderdale, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Jeanine Germanowicz, Assistant Attorney General, West Palm Beach, for appellee.

TAYLOR, J.

Pedro Fajardo appeals his conviction and sentence for attempted second degree murder. We reverse, because the trial court improperly precluded appellant from questioning a key state witness about his detention at an immigration detention facility when, during an interview with a detective, he identified appellant from a photo lineup.

Appellant was charged by information with attempted second degree murder based on the following events. During the early morning hours of November 3, 2012, Elvin Ortiz (the victim) was visiting a house used illegally as an after-hours bar. Before going to the bar, he had consumed twelve to fifteen beers at his cousin's house. When Ortiz arrived at the bar, he went inside to buy two beers for himself and his cousin. The two men drank the beer outside by the car. Soon Ortiz started talking with a woman there.

Fausto Garsia (the key state witness) arrived after Ortiz. Ortiz and Garsia had been friends for several years. After they greeted each other, Garsia went inside the house. Later that night, Ortiz got into a physical

altercation with a woman who he believed stole his wallet. When Ortiz tried to stop the woman from leaving, two men approached Ortiz and told him to let the woman go. Ortiz described one man as "the man who cut me" and the other man as "the Mexican." Ortiz later testified at trial that he did not actually see the person who stabbed him. "The Mexican" asked Ortiz if he wanted any problems and then he started pushing Ortiz.

The altercation moved into the street. The "man who cut" Ortiz got into a truck and drove it towards him. Ortiz jumped out of the way, and the truck drove past him. After the truck passed him, Ortiz continued to argue with "the Mexican."

Ortiz heard the truck park behind him and the door open. He then heard appellant behind him say, "Let's go. Let's leave it like that." Ortiz did not see the person who cut him, did not see a weapon, and did not feel his body being cut. He did not even know that he had been stabbed until Garsia told him. He soon realized that he was bleeding from his neck and side.

After Ortiz was released from the hospital, the police brought him a photo lineup. From the lineup, he identified the person who he thought stabbed him. He also identified appellant as one of the men he argued with, and identified photographs of the truck that he believed belonged to the man who tried to run over him.

When Garsia testified, he gave a more incriminating account of appellant's participation in the altercation. On the night of the incident, Garsia saw Ortiz get into an argument with a woman and three men. Garsia made an in-court identification of appellant as one of the three men. Garsia had seen appellant before at the restaurant where Garsia worked, but Garsia did not recognize the other two men.

During the argument, one of the other two men started hitting Ortiz with his fist. Appellant joined in and "hit" Ortiz in his neck, ribs, and stomach. Ortiz was facing appellant during this attack. Appellant's hands were closed at the time, and Garsia, who was standing about ten feet away, admitted that he never actually saw any weapon.

After appellant "hit" the victim three times, he and the other men got into a truck and drove away. Garsia then ran over to help Ortiz, who was bleeding profusely from his neck and stomach. Ortiz appeared to be losing consciousness.

Garsia called the police. When the police arrived, Garsia explained

what happened and gave the police a description of the truck. However, he did not give a description of the assailants. The ambulance arrived to transport Ortiz to the hospital, and Garsia contacted Ortiz's family.

Detective Moulin compiled a photo lineup that included appellant's photo. Detective Metz presented the lineup to the witnesses. Detective Metz testified that Ortiz and Garsia identified appellant from the photo lineup.

Before opening statements, defense counsel informed the judge that she intended to elicit testimony that Garsia was detained at an immigration facility when the detective interviewed him and displayed the photo line-up. She argued that evidence that Garsia was being held at the immigration facility when he identified appellant was relevant to the issue of bias and motive, because Garsia may have sought to curry favor by cooperating as a witness. Before his detention, at the scene of the crime, Garsia was unable to identify the perpetrators. Further, Garsia was released from the detention center before trial for reasons unknown to the parties.

The state objected to questioning Garsia about his detention at an immigration facility during the photo identification. The state argued that there was no evidence that Garsia knew that his cooperation with the police would result in his release from custody. The defense responded that the issue was whether Garsia *believed* the state might be able to assist him in obtaining his release. Ultimately, the trial court ruled that defense counsel could not inquire about Garsia's immigration detention on cross-examination.

The jury found appellant guilty of attempted second degree murder.

On appeal, appellant argues that the trial court improperly precluded him from questioning a key state witness about his detention at an immigration facility when identifying appellant from a photo lineup. He contends that the evidence was relevant to prove the witness's possible bias and motive, i.e., Garsia's subjective belief that cooperating with the state by identifying appellant would benefit his immigration status.

Although the state acknowledges that defense counsel timely brought this matter to the trial court's attention, it argues that she failed to preserve this issue by: (1) making an offer of proof regarding how the witness would have responded to questions about his immigration detention if allowed, and (2) demonstrating a good faith belief through some evidence that Garsia was actually influenced by his immigration

3

detention to falsely identify the defendant.

We disagree with both of the state's positions on preservation. First, as to the state's suggestion that the issue was unpreserved because defense counsel did not proffer how Garsia would have testified, we note that defense counsel advised the court that Garsia was in immigration custody, possibly under threat of deportation, when he identified appellant from a photo lineup. Defense counsel advised the court that she wanted to ask Garsia if he believed that cooperating with the state would lead to his release from custody or otherwise benefit his immigration status. She explained that the circumstances surrounding the photo identification would show possible bias. Thus, the substance of the excluded evidence was apparent from the context, and it was relevant to show the witness's motive, bias, and self-interest.[1] *See Holley v. State*, 48 So. 3d 916, 920 (Fla. 4th DCA 2010) (defense counsel sufficiently preserved the issue of restrictions on counsel's cross-examination of a witness where, even though counsel did not proffer the questions to be asked, the information counsel sought to question the witness about was relevant to show the witness's bias). We find, as we did in *Holley*, that this issue was sufficiently preserved for our review.

Second, contrary to the state's argument, there is no requirement, as a predicate to admissibility of testimony to show bias, that defense counsel present evidence of the witness's actual belief he will benefit by testifying. The defense is not required to produce an agreement with law enforcement officials for favorable treatment in exchange for the witness's cooperation. *See Thornes v. State*, 485 So. 2d 1357, 1359 (Fla. 1st DCA 1986) (explaining that the defense is not required to show that the state and the witness have first entered into an agreement providing for the manner in which the witness will testify and the effect of such testimony on any future action which the state may take against the witness); *Jean-Mary v. State*, 678 So. 2d 928, 928–29 (Fla. 3d DCA 1996) (stating that the rule entitling the defense to bring out the fact that a prosecution witness is under actual or threatened criminal charges applies even where there is no specific evidence of any agreement between the witness and the state).

"The mere chance that a witness, in [his or] her own mind, may be attempting to curry favor is sufficient to allow for broad cross-examination

---

[1] Moreover, regardless of how Garsia would have answered defense counsel's proposed line of questioning concerning his alleged bias, the jury should have been informed of the circumstances of the photo identification and should have been permitted to evaluate the credibility of Garsia's responses in light of that information.

in order to show bias." *Thornes*, 485 So. 2d at 1359; *see also United States v. Oliveros*, 275 F.3d 1299, 1307 (11th Cir. 2001) ("[W]hat counts is not the actual extent of the benefit the witness has received or will receive, but the witness' belief about what he is getting. . . . The bias of a witness is a subjective fact influenced by that witness' beliefs about the benefit he will receive if he testifies in a particular way and the value of it to him, which is measured by what he thinks will happen if he does not receive the benefit.").

In sum, we reject the state's argument that appellant failed to preserve this issue.

We review a trial court's limitation of cross-examination for abuse of discretion. *McDuffie v. State*, 970 So. 2d 312, 324 (Fla. 2007). "A trial court's discretion in this area, however, is constrained by the rules of evidence . . . and by recognition of a criminal defendant's Sixth Amendment rights." *Id.* (citation omitted).

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant's right to confront his accusers. It provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend. VI. "[T]he Confrontation Clause requires that a defendant be allowed to cross-examine a witness regarding credibility 'if that examination aims to reveal the motive, bias or prejudice of a witness/accuser.'" *Carlisle v. State*, 137 So. 3d 479, 485 (Fla. 4th DCA 2014) (quoting *Pantoja v. State*, 59 So. 3d 1092, 1099 (Fla. 2011)); *see also* § 90.608(2), Fla. Stat. (2013) ("Any party, including the party calling the witness, may attack the credibility of a witness by: [s]howing that the witness is biased.").

"[A] trial court may not prohibit cross-examination when the facts sought to be elicited are germane to that witness' testimony and plausibly relevant to the theory of defense." *Martino v. State*, 964 So. 2d 906, 908 (Fla. 4th DCA 2007) (citations and internal quotation marks omitted). Even when the inquiries on cross-examination appear at first blush to be lacking any basis, the court should allow such inquires "so long as counsel states a basis tending ultimately to show such bias." *Purcell v. State*, 735 So. 2d 579, 581 (Fla. 4th DCA 1999).

As the United States Supreme Court explained in *Davis v. Alaska*, 415 U.S. 308 (1974), "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. There, the Court held that refusal to allow the defendant to cross-examine a key prosecution witness about his probationary status denied

the defendant his constitutional right to confront witnesses, notwithstanding the state's policy protecting anonymity of juvenile offenders. *Id.* at 320.

Recognizing a defendant's strong interest in revealing a witness's possible bias, our court, in *Cipriano v. State*, 883 So. 2d 363, 364 (Fla. 4th DCA 2004), ordered the trial court to hold an evidentiary hearing on the defendant's post-conviction claim that his counsel was ineffective for failing to impeach a witness with his probationary status and immunity agreement.

Similarly, in *Auchmuty v. State*, 594 So. 2d 859 (Fla. 4th DCA 1992), we held that the trial court abused its discretion in barring the defense from cross-examining an eyewitness to the murder of the defendant's estranged wife's lover about charges pending against the witness for violation of probation. *Id.* at 860.

It is well-settled that "if a witness for the State were presently or recently under actual or threatened criminal charges or investigation leading to such criminal charges, a person against whom such witness testifies in a criminal case has an absolute right to bring those circumstances out on cross-examination or otherwise so that the jury will be fully apprised as to the witness' possible motive or self-interest with respect to the testimony he gives." *Morrell v. State*, 297 So. 2d 579, 580 (Fla. 1st DCA 1974).

Although the above-cited cases concerned potential criminal sanctions, "deportation . . . in many cases is a harsher punishment than any sentence [a person] may face. . . ." *Labady v. State*, 783 So. 2d 275, 277 (Fla. 3d DCA 2001). Furthermore, as discussed above, considerable latitude should be accorded a defendant in attempting to establish a witness's bias. Here, defense counsel sought to elicit evidence that Garsia was being held in an immigration detention center when he identified appellant, and that he may have believed he could get released and avoid deportation by providing such assistance to law enforcement. Because this line of inquiry went directly to Garsia's bias, motive, and self-interest, the trial court abused its discretion in precluding appellant from questioning him on this subject.

The state next argues that defense counsel's proposed cross-examination, even if permissible, was properly restricted because the probative value of Garsia's immigration status was substantially outweighed by the danger of unfair prejudice. The state contends that "counsel was merely trying to disparage the witness and appeal to any

latent bias against immigrants in the jurors." This contention, however, lacks any foundation in the record. Defense counsel's questions about the witness's immigration detention appear aimed only at exposing any bias or motive to be untruthful. *See, e.g., Liotta v. State*, 939 So. 2d 333, 334 (Fla. 4th DCA 2006) (holding that the defense witness's immigration status was relevant to bias because the defendant was his employer, landlord, and sponsor for an immigration visa).

In any case, while a trial court has "a duty to protect [a witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy, or humiliate [the witness]," *Alford v. United States*, 282 U.S. 687, 694 (1931), a defendant's right of confrontation is paramount to the state's interest in protecting a witness from prejudice. *See, e.g., Davis*, 415 U.S. at 319–20 (commenting that whatever temporary embarrassment might result to the juvenile witness or his family by disclosure of his juvenile record is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness).

Finally, we are unable to find that the error in precluding defense counsel's cross-examination of Garsia regarding his immigration detention was harmless. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986) ("The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction."). Garsia is the only person who testified about seeing appellant strike the victim. Although the victim identified appellant in a photo lineup as one of the men he argued with, he did not actually see appellant stab him. He testified only that he heard what sounded like appellant's voice behind him saying "let's go. Let's leave it like that." Moreover, the victim never made an in-court identification of appellant. Garsia was the only witness to make an in-court identification of appellant as being present at the scene of the assault. He was thus a critical witness upon whom the state's case depended.

We find no error in the trial court's denial of appellant's motion for judgment of acquittal or in its other rulings in this case. For the reasons discussed above, however, we reverse and remand this case for a new trial.

*Reversed and Remanded for new trial.*

CIKLIN, C.J., and KLINGENSMITH, J., concur.

*　　　*　　　*

*Not final until disposition of timely filed motion for rehearing.*