ORFINGER, J.
Favian Rivera seeks review of his conviction of first-degree murder with a firearm and sentence of life with no judicial sentencing review. We conclude the trial court unduly restricted Rivera's cross-examination of his co-defendant, a key State witness, and reverse.
Rivera and his co-defendant, Brandon Soto, both juveniles, were indicted for the first-degree premeditated murder of Hector Jorge-Pabon.[1] Soto went to trial first and was found guilty of first-degree murder with special findings that he possessed and discharged a firearm that resulted in death. Post-verdict, in exchange for his testimony at Rivera's trial, Soto entered into an agreement with the State for a sentence of fifteen years in prison with a ten-year minimum mandatory term, thereby avoiding a forty-year to life sentence with judicial review after twenty-five years pursuant to the juvenile sentencing laws, sections 775.082, 921.1401, and 921.1402, Florida Statutes (2014).
At Rivera's trial, defense counsel sought to inform the jury about the specifics of Soto's plea deal. The trial court ruled that Rivera could elicit that Soto was convicted of first-degree murder and the agreed-upon fifteen-year sentence. However, the trial court denied defense counsel's request to advise the jury that Soto's conviction carried a potential forty-year to life sentence with a twenty-five-year minimum mandatory because the trial judge was concerned that this information would inform the jury of Rivera's potential sentence.[2] Rivera was subsequently found *540 guilty of first-degree murder with special findings that he possessed and discharged a firearm that resulted in death. After an individualized sentencing hearing, he was sentenced to life in prison.
As the State argues, as a general rule, jurors are not to be told of the potential sentence a defendant faces if convicted. See Fla. R. Crim. P. 3.390(a). This is to minimize the possibility of jury sympathy based on the defendant's potential sentence and to ensure that the jury decides the case according to the law and evidence presented, rather than the consequences of its verdict. Knight v. State, 919 So. 2d 628, 634 (Fla. 3d DCA 2006). But against this procedural rule, we must weigh a criminal defendant's Sixth Amendment right to confront the witnesses against him, which includes wide latitude in cross-examining state witnesses, especially when cross-examining an accomplice or key prosecution witness. Elmer v. State, 114 So. 3d 198, 201 (Fla. 5th DCA 2012) ; Powe v. State, 413 So. 2d 1272, 1273 (Fla. 1st DCA 1982) ; Wolfe v. State, 190 So. 2d 394, 395 (Fla. 1st DCA 1966) (explaining that policy of law is that accomplice's testimony is disfavored, subject to close scrutiny, and should be received with caution by jury since some persons charged with or convicted of crime are willing to wrongfully implicate others if by doing so, they may mitigate penalty against themselves).
Cross-examination is often "the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). While the trial court has broad discretion to impose reasonable limits on cross-examination when it is concerned about, "among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," Moore v. State, 701 So. 2d 545, 549 (Fla. 1997) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ), the court's discretion is constrained by a criminal defendant's Sixth Amendment rights and the rules of evidence, Patrick v. State, 104 So. 3d 1046, 1057 (Fla. 2012).
In Henry v. State, 123 So. 3d 1167, 1169-70 (Fla. 4th DCA 2013), the Fourth District wrote:
"[T]he Sixth Amendment guarantees the right of an accused to attack a witness' credibility by means of cross-examination directed toward revealing possible biases or ulterior motives of the witness as they may relate to the case at hand." Smith v. State, 38 So. 3d 871, 872 (Fla. 4th DCA 2010) (citing Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) ). "For purposes of discrediting a witness, a wide range of cross-examination is permitted as this is the traditional and constitutionally guaranteed method of exposing possible biases, prejudices and ulterior motives of a witness as they may relate to the issue or personalities ...." Strickland v. State, 498 So. 2d 1350, 1352 (Fla. 1st DCA 1986) (citations omitted). "The vital importance of full and searching cross-examination is even clearer when, as here, the prosecution's case stands or *541 falls on the jury's assessment of the credibility of the key witness[ ]." Id. (citing Wooten v. State, 464 So. 2d 640 (Fla. 3d DCA 1985) ). Under such circumstances, "[o]bviously, a defendant has a strong interest in discrediting a crucial state witness by showing bias, an interest in the outcome, or a possible ulterior motive for his in-court testimony." Livingston v. State, 678 So. 2d 895, 897 (Fla. 4th DCA 1996) (citing Phillips v. State, 572 So. 2d 16 (Fla. 4th DCA 1990) ).
The evidence code allows a party to attack a witness's credibility based on bias. § 90.608(2), Fla. Stat. (2014) ("Any party, including the party calling the witness, may attack the credibility of a witness by ... [s]howing that the witness is biased."). Any relevant evidence tending to establish that a witness is appearing for the prosecution for any reason other than to tell the truth should not be kept from the jury. Holt v. State, 378 So. 2d 106, 108 (Fla. 5th DCA 1980). Defendants may cross-examine a witness about the conditions of a plea bargain entered into between the state and the witness. Engram v. State, 405 So. 2d 428, 429 (Fla. 1st DCA 1981) (citing Lee v. State, 324 So. 2d 694 (Fla. 1st DCA 1976) ). That examination includes inquiry into the specific nature of the pending charges against a cooperating state witness, see, e.g., Henry, 123 So. 3d at 1170 ; Bell v. State, 614 So. 2d 562, 564 (Fla. 3d DCA 1993), and how the pending criminal charges may have influenced the witness's cooperation with the state and the content of in-court statements, see Breedlove v. State, 580 So. 2d 605, 608 (Fla. 1991) ; Pomeranz v. State, 634 So. 2d 1145, 1146 (Fla. 4th DCA 1994).
Here, Soto was convicted of first-degree murder with a firearm, the same charge that Rivera was facing. The court permitted evidence that Soto agreed to a fifteen-year sentence in exchange for his testimony against Rivera, but prohibited Rivera from informing the jury that without the fifteen-year plea agreement, Soto would have been sentenced to at least forty years, up to life, with eligibility for judicial review after twenty-five years. See Montgomery v. State, 230 So. 3d 1256, 1262 (Fla. 5th DCA 2017). Thus, Rivera was not allowed to question Soto on the pertinent details of his plea agreement and establish his motive or bias in testifying against him-the mandatory sentence that Soto would (and believed that he would) receive in the absence of the plea agreement. See Fajardo v. State, 193 So. 3d 1019, 1023-24 (Fla. 4th DCA 2016) (explaining that defendant's belief that he could get released and avoid deportation by assisting law enforcement was relevant to witness's bias, motive, and self-interest); see also United States v. Oliveros, 275 F.3d 1299, 1307 (11th Cir. 2001) ("When it comes to a witness' motive to lie, however, what counts is not the actual extent of the benefit the witness has received or will receive, but the witness' belief about what he is getting.... The bias of a witness is a subjective fact influenced by that witness' beliefs about the benefit he will receive if he testifies in a particular way and the value of it to him, which is measured by what he thinks will happen if he does not receive the benefit.").
The exclusion of this evidence prevented Rivera from demonstrating the full extent of Soto's interest in the case and his motivation to testify consistent with the State's theory of prosecution. See, e.g., Henry, 123 So. 3d at 1169 (holding that defendant's counsel was entitled to elicit evidence about degree of felony and maximum prison penalty witness faced to demonstrate his motive and bias to testify against defendant); Jackson v. State, 37 So. 3d 370, 373 (Fla. 2d DCA 2010) (holding that trial *542 court abused its discretion in prosecution for cocaine trafficking by refusing to allow defendant to cross-examine codefendants, who purchased cocaine from defendant, regarding length of maximum sentence or mandatory minimum prison term; codefendants pleaded guilty and testified against defendant in hopes of receiving more lenient sentences, and therefore, defendant had right to cross-examine on sentence length to reveal extent of bias, prejudice, or improper motive codefendants may have had in testifying); Powe, 413 So. 2d at 1273 (reversing because trial court refused to allow defense counsel to inquire about minimum mandatory penalty that state's key witness avoided with guilty plea; witness's knowledge of penalty may have been significant factor in decision to testify against defendant).
At the very least, the trial court should have allowed Rivera to inform the jury that Soto was facing a significantly more severe or substantial sentence in the absence of his plea agreement. See, e.g., United States v. Walley, 567 F.3d 354, 358-59 (8th Cir. 2009) (affirming limitation as jury was aware that prosecution witness faced possibility of "significant sentence" for criminal activity, and no indication that evidence of specific sentence would have given jury "significantly different impression" of witness's credibility). Limiting the cross-examination of a state witness violates the Sixth Amendment when, as here, a defendant shows that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." Van Arsdall, 475 U.S. at 680, 106 S.Ct. 1431. Shielding the jury from such information is intended to prevent the jury from reaching a verdict based on sympathy for the defendant's plight contrary to their oath to render a verdict based only on the law and the evidence. Such considerations, while entirely valid, do not outweigh Rivera's Sixth Amendment rights and do not justify keeping the details of Soto's agreement from the jury in the circumstances here. "The human condition strongly suggests that a person may not be willing (or likely) to lie under oath if he expects his benefit to be 8 years in prison rather than 9, but his incentive to dissemble and falsify may increase exponentially if he expects to serve a couple of years in prison instead of a couple of decades." United States v. Rushin, 844 F.3d 933, 942-43 (11th Cir. 2016) (Jordan, J., concurring).
We do not suggest that in every case such broad cross-examination is appropriate. But here, Soto was a key State witness and the only witness who could offer evidence of premeditation. Hence, we cannot conclude the error was harmless. The examination into and evidence of bias, motive or self-interest was clearly relevant and, if proven, could have impacted Soto's credibility. The State cannot prove beyond a reasonable doubt that the error did not contribute to Rivera's conviction. See State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986) ("The question is whether there is a reasonable possibility that the error affected the verdict.").
For these reasons, we reverse Rivera's conviction for first-degree premeditated murder and remand for a new trial. Because we conclude that Rivera is entitled to a new trial, we need not address Rivera's other arguments regarding the constitutionality of the juvenile sentencing laws. See Singletary v. State, 322 So. 2d 551, 552 (Fla. 1975) ("[C]ourts should not pass upon the constitutionality of statutes if the case in which the question arises may be effectively disposed of on other grounds.").
*543 For purposes of remand, however, we briefly address the jury instructions. The trial court properly gave an initial aggressor jury instruction in this case because there was a factual dispute that Rivera may have initially provoked the use of force against himself. See, e.g., Thompson v. State, 257 So. 3d 573, 581 (Fla. 1st DCA 2018) ; Johnson v. State, 65 So. 3d 1147, 1149 (Fla. 3d DCA 2011). However, the jury instruction, as given, did not accurately state the law because it improperly implied that Rivera was required to establish two circumstances before invoking self-defense. Instead, only one or the other circumstance is required-there was no means of escape other than the use of deadly force, or the provoking person withdrew from physical contact or unequivocally indicated his desire to withdraw from the confrontation and the alleged victim continued or resumed the use of force. See § 776.041 (2), Fla. Stat. (2014) ; State v. Floyd, 186 So. 3d 1013, 1022 (Fla. 2016) ; Darling v. State, 81 So. 3d 574, 578 (Fla. 3d DCA 2012). Thus, on remand, the trial court must properly instruct the jury on the initial aggressor exception, inserting the "or" between the alternative circumstances, as reflected in the recent amendment to the jury instructions. See In re Std. Jury lnstr. in Crim. Cases-Report 2017-07., 257 So. 3d 908, 922 (Fla. 2018).
AFFIRMED in part; REVERSED in part; and REMANDED with instructions.
WALLIS, J., concurs.
EDWARDS, J., concurs in part, and dissents in part, with opinion.
EDWARDS, J., concurring in part, dissenting in part.
I concur with the majority that an initial aggressor jury instruction should have been given, but that it should have been worded differently as described in the majority opinion. However, I respectfully dissent with regard to the majority's determination that Rivera did not receive a fair trial because the jury was not told the precise prison sentence a key witness would have faced but for a deal he made with the State.
Favian Rivera, a juvenile at the time he shot Hector Jorge-Pabon ("Hector"), asks that we set aside the jury's verdict and reverse his conviction of first-degree murder with a firearm. Rivera asserts that he was deprived of the ability to effectively cross-examine a key witness against him. On appeal, for the first time, he makes the specific argument that this violated his Sixth Amendment right to confrontation. Rivera claims that the jury did not have enough information to reach an informed decision about whether his co-defendant, Brandon Soto, was a liar whose testimony may not be reliable. That argument lacks merit. Nobody needed to measure Pinocchio's nose to understand that he often lied, nor did the jury need to know the exact sentence that the convicted murderer Soto avoided through his deal to understand that Soto was a liar who was highly motivated to provide testimony that would please the State.
The trial court's only limitation on Rivera's cross-examination of Soto was the one imposed by Florida Rule of Criminal Procedure 3.390(a), which meant that Rivera was not allowed to ask Soto what prison sentence Soto would have faced but for the deal he made with prosecutors. Rivera faced the same charge on which Soto had been found guilty, the first-degree murder with a firearm of Hector. Soto's trial concluded the week before Rivera's; thus, advising the jury of Soto's potential sentence would essentially have advised the jury of Rivera's potential sentence, which is contrary to Rule 3.390(a).
*544 The logic underlying this rule is to minimize the possibility of the jury being swayed by the penalty and to ensure that the jury's decision is based only on the law and evidence presented. Knight v. State , 919 So. 2d 628, 634 (Fla. 3d DCA 2006).
Granted, Soto's potential sentence would have been relevant here because evidence tending to prove that a witness is motivated by a deal with the State to testify against a defendant and in favor of the prosecution is usually admissible. In particular, a defendant may cross-examine a witness about the conditions of a plea bargain entered into between the State and the witness. Engram v. State , 405 So. 2d 428, 429 (Fla. 1st DCA 1981) (citing Lee v. State , 324 So. 2d 694 (Fla. 1st DCA 1976) ). That examination usually includes an inquiry into the specific nature of the pending charges against a cooperating state witness. See Henry v. State , 123 So. 3d 1167, 1170 (Fla. 4th DCA 2013) ; Bell v. State , 614 So. 2d 562, 564 (Fla. 3d DCA 1993). In Henry the defendant was charged with raping his cellmate, the deal-receiving witness. Henry's defense to the charge was that their sexual encounter while in jail was consensual. 123 So. 3d at 1170. The witness/victim lied in response to the prosecutor's questions about receiving any deal from the State, creating the false impression that he was not offered leniency or any other benefit to testify. Id. at 1168. In fact, the witness/victim had been charged with a felony, faced up to five years in prison which was reduced to eighteen months of probation, and was only released from jail after working out the plea deal. Id. The trial court denied the defense's proffered cross-examination, which would have disclosed the witness's possible motivation to testify against him. Id. Indeed, Henry's right to cross-examine the victim, who was the sole witness that could undermine his consensual sex defense, was unduly hampered. The Henry jury was left with the false impression that the key witness was not possibly motivated by a deal to slant his testimony in favor of the State; no such false impression existed in the case at hand. Furthermore, Rule 3.390(a) was not implicated or discussed in Engram , Lee , Henry , or Bell . Thus, those cases do not provide an answer for determining whether a defendant, who is facing the same penalty as the deal-motivated witness, must be permitted to advise the jury of the details of the prison sentence they both faced.
EVIDENCE OF THE CRIME
In Rivera's trial, the jury heard evidence that at the time of the murder, Soto and Rivera were best friends and that Rivera had been humiliated and beaten up months earlier by Jomar, Hector's younger brother. Jomar and Kayla Oms, Rivera's girlfriend, testified that earlier on the day of the murder, Rivera pulled his gun and threatened Jomar. The jury heard that Jomar ran home when he saw Rivera's gun. Hector vowed to Jomar that he would take Rivera's gun from him, and they went looking for Rivera. Meanwhile, Rivera, Kayla, and Soto armed themselves with pistols and went looking for Jomar.[3]
The testimony of several witnesses, including Soto, was that Jomar and Hector appeared unexpectedly in front of Rivera, Soto, and Kayla. Neither Rivera, Soto, nor Kayla had ever met Hector previously. Jomar confirmed to his brother that Rivera was the guy who threatened him with a gun earlier that day.
*545 According to the testimony of Soto, Kayla, and Jomar, the unarmed victim walked towards Rivera without gesturing or saying anything else. In an instant, and without a word, Rivera pulled his gun and shot Hector in the stomach, severing his aorta. Jomar immediately ran away. There was conflicting testimony about whether it was Soto or Rivera who chased after Jomar, trying but failing to shoot him due to a jammed gun. There was further conflicting testimony about whether it was Soto or Rivera who then shot Hector in the head as he lay bleeding on the ground. The medical examiner testified that both shots were potentially fatal; this provided a basis for the proposition that each shooter killed Hector, and both could be found guilty of his murder.
Soto was a key witness in terms of providing testimony of Rivera's premeditated intent to shoot Jomar. Soto repeatedly testified, and the prosecution argued to the jury, that because of the previous humiliation and beating inflicted by Jomar, Rivera declared an "SOS" on Jomar, which meant to shoot or stomp or stab Jomar on sight. Jomar testified that on one occasion, before the day of his brother's murder, Rivera made a shooting gesture and, on another occasion, Rivera tried unsuccessfully to jump Jomar. Kayla testified that Rivera told her after Jomar humiliated and punched him that Rivera wanted his chance to fight Jomar one-on-one. Soto denied shooting Hector and claimed that Rivera had fired both shots. Immediately after the shooting, Soto and Rivera separately fled the scene and days later, each separately left Florida in an effort to avoid arrest and prosecution. The week before Rivera's trial started, Soto was tried and convicted of the first-degree murder of the same victim, Hector.
The State argued that Rivera's premeditated intent to shoot Jomar, embodied in the SOS, could be transferred to the killing of Hector. However, the State also argued that the very short time interval between Rivera encountering and then shooting Hector was independent proof of premeditated murder. The State explained that it was just like the premeditation involved in seeing then swatting a mosquito on your arm after briefly considering the bug's fate. It is clear that, while Soto's testimony about the SOS was relevant to premeditation, the jury heard relevant testimony from other witnesses about premeditation. Thus, it would not be accurate to say that Soto was alone in providing the evidentiary basis for the jury to find Rivera's murder of Hector premeditated.
SIXTH AMENDMENT CONFRONTATION
Rivera made it clear to the trial court that he wanted to advise the jury through cross-examination that Soto faced a prison sentence of forty years to life but for his plea deal. However, Rivera never argued to the trial court that his Sixth Amendment right to confront witnesses was being impaired by the sole limitation placed on exposing Soto's testimonial motivation and otherwise unhampered cross-examination into other factors surrounding Soto's credibility. "In order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below." Corona v. State , 64 So. 3d 1232, 1242 (Fla. 2011) (emphasis added) (quoting Harrell v. State, 894 So. 2d 935, 940 (Fla. 2005) ). While there is no requirement "that a defendant intone special 'magical words' in order to preserve a Sixth Amendment Crawford[4] claim, the defendant must be "sufficiently specific to inform the court of *546 the perceived error." Id. In Corona , the supreme court found that the defendant's hearsay objection "fairly appraised the trial court of the relief sought and the grounds therefore," because the defendant had just made a hearsay objection specifically invoking the confrontation clause. Id. at 1242-43 (quoting § 924.051(1)(b), Fla. Stat. (2002) ). Furthermore, in Corona , after denying the specific confrontation clause objection, the trial court announced in response to counsel's next hearsay objection that counsel "had a standing objection to this line of questioning, and based upon prior rules [sic] by this court, I'm going to overrule those objections. But you've preserved your objection." Id. at 1242. The supreme court found this sufficient to preserve a Crawford claim, but noted that a general objection on hearsay grounds, without mentioning the confrontation clause, would have been insufficient. In this case, because Rivera never mentioned the Sixth Amendment below, he failed to "fairly appraise the trial court" of an arguable constitutional basis for violating Rule 3.390(a). Id. at 1243. The trial judge had no opportunity to consider the never-raised constitutional argument or to fashion appropriate relief that would have, on one hand, sufficiently preserved Rivera's Sixth Amendment rights to his satisfaction, and on the other, still complied with Rule 3.390(a). Rivera's constitutional argument, which was not made below, should not be adopted now as the basis for finding the trial court reversibly erred. However, because the majority grants a new trial based solely on this unpreserved constitutional issue, it will be addressed below.
It is undisputed that Rivera was entitled by Florida law and the Sixth Amendment to develop and demonstrate Soto's lack of credibility through cross-examination and other methods of impeachment. In Henry , the Fourth District Court pointed out that "the Sixth Amendment guarantees the right of an accused to attack a witness' credibility by means of cross-examination directed toward revealing possible biases or ulterior motives of the witness as they may relate to the case at hand." 123 So. 3d at 1169 (quoting Smith v. State , 38 So. 3d 871, 872 (Fla. 4th DCA 2010) ). Traditional means of attacking a witness's credibility include introducing prior inconsistent statements made by the witness, advising the jury that the witness is a convicted felon, and presenting evidence regarding the witness's reputation as a liar.
SOTO'S CREDIBILITY - OPENING STATEMENTS
While the State did not describe Soto as a liar in its opening statement, it clearly set the stage for showing that Soto would be lying if he denied shooting Hector in the head. Defense counsel commenced the attack on Soto's credibility in opening, pointing out that, only a week before, he went to trial, was convicted of the first-degree murder of the same victim, and was facing sentencing. Defense counsel told the jury that over the weekend Soto had made a deal with the State to testify against Rivera in return for which Soto's "sentence will be limited to only 15 years." (emphasis added). Defense counsel cautioned the jury that Soto's testimony "was going to be different from anything he said before," and that it was "going to be self-serving testimony" against Rivera. So, before any witness testified, Rivera's counsel was preemptively impeaching Soto as a self-interested convicted felon who had strong ulterior motives to testify differently than he had before, now in favor of the State and against Rivera, in order to receive favorable treatment, i.e., a reduced sentence.
SOTO'S CREDIBILITY - TESTIMONY
When Soto testified at trial, defense counsel wasted no time attacking his credibility *547 on cross-examination. The first credibility hit was achieved by having Soto admit that he was a convicted felon-indeed a murderer-who was not going to appeal his conviction. Next, defense counsel got Soto to admit that he had not testified truthfully at his own trial. Soto said he lied so that he "could go home." Next, Soto spelled out the terms of his deal with the State-that he would serve only 15 years in prison. Soto agreed that he was "not in danger of having any more than 15 years under the terms of this deal." (emphasis added). Soto admitted on cross-examination that as part of the deal, the State agreed it would not prosecute him for perjury regarding the lies he told during his own trial.
After scoring numerous credibility-weakening blows, defense counsel then got Soto to admit that he was testifying against Rivera in order to help himself. Thus, Rivera was permitted to cross-examine Soto thoroughly, establishing Soto's felony conviction, that he was a self-admitted liar who committed perjury only the week before, and that he had an ulterior, self-serving motive to testify favorably for the State.
It is true that Rivera had to omit sharing one detail about Soto's deal-the sentence he would otherwise have received. However, even as to that one missing piece of information, defense counsel made it clear in opening statement and on cross-examination that, but for the deal, Soto knew he would have "been in danger" of serving a longer sentence instead of being "limited to only" 15 years. Given that Soto's conviction was for first-degree murder with a firearm, coupled with the nod and wink from defense counsel, it strains credulity to argue that the jury may have thought Soto would otherwise have faced a sentence that was only insignificantly longer than fifteen years, and thus discounted the motivation provided by Soto's deal.
The fact that witnesses will try to get reduced sentences by testifying for the State was reinforced during this trial with regard to Correa, a federally convicted drug dealer who testified that Rivera made inculpatory admissions to him when they were cell mates. Even though Correa had already been sentenced, he admitted that he hoped the federal judge might reduce his prison sentence upon learning that Correa had cooperated with the State in this case.
SOTO'S CREDIBILITY - CLOSING ARGUMENTS
The State's closing argument included admissions that Soto lied during his own trial and an implied admission that he lied in Rivera's trial when Soto denied shooting Hector in the head. In its rebuttal closing argument, the State cautioned the jury about which parts of Soto's testimony it should believe. The State said it was not asking the jury to just run with Soto's testimony, nor was it asking the jury to believe everything Soto said. Rather, the State said the jury should only rely upon those portions of Soto's testimony that were consistent with other evidence.
Rivera's closing argument started out by directly calling Soto a liar, saying that none of his testimony should be accepted or taken to the bank. Defense counsel argued that for self-serving reasons, both Soto and Correa were hoping that the testimony they provided for the State would lead to Rivera's conviction. Counsel bolstered the argument against believing Soto or Correa by referring to an instruction the jury would soon receive-that when judging any witness's credibility, it should consider whether that witness was offered or had received preferential treatment *548 or some other benefit in order to testify.
Rivera's credibility attack in closing argument continued by pointing out that the witness, presumably Soto, had at other times given statements that were inconsistent with trial testimony. Defense counsel also warned the jury against accepting the testimony of "jailbird witnesses," all of whom were convicted felons. Finally, defense counsel told the jury to disregard the testimony of Soto because he was a stone-cold killer, and made an appeal seemingly based on the code of the Old West-that the jury should not believe Soto because he was willing to shoot Jomar in the back.
SOTO'S CREDIBILITY - JURY INSTRUCTIONS
When considering whether Rivera was given a fair trial, the instructions given to the jury regarding witness credibility must be taken into account. The jury here was instructed that when weighing the evidence, it should consider whether: (1) the witness had some interest in how the case should be decided; (2) the witness had been offered or received preferred treatment or other benefit in order to get the witness to testify; (3) the witness had made prior inconsistent statements; and (4) the witness had been convicted of a felony.
The following jury instruction given by the trial court was particularly pertinent to Soto's credibility and effectively cautioned the jury about accepting Soto's testimony because of his deal with the State:
You must consider the testimony of some witnesses with more caution than others. For example, a witness who claims to have helped the defendant commit a crime or has been promised immunity from prosecution or hopes to gain more favorable treatment in his or her own case may have a reason to make a false statement in order to strike a good bargain with the State. This is particularly true when there is no other evidence tending to agree with what the witness says about the defendant. So while a witness of that kind may be entirely truthful when testifying, you should consider his or her testimony with more caution than the testimony of other witnesses. However, if the testimony of such a witness convinces you beyond a reasonable doubt of the defendant's guilt or the other evidence in the case does so, then you should find the defendant guilty.
SOTO'S CREDIBILITY AND RULE 3.390(a)
The trial court properly applied Rule 3.390(a) as a limit to the attack on Soto's credibility. That rule can be viewed similarly to section 90.403, balancing the relevance of a defendant's potential sentence against the possibility that a jury's decision could be swayed if it was advised of the potential sentence. The trial court invited defense counsel to "harp on the fact that he got a deal," but forbade any discussion of the fact that Soto possibly faced a life sentence or of the potentially applicable mandatory minimums. Even in the "he said-he said" circumstances of Henry , relied upon by the majority, the Fourth District cautioned that the trial court must engage in a section 90.403 analysis regarding whether certain details should not be disclosed regarding the favorable terms a deal-motivated witness receives. 123 So. 3d at 1170-71. As noted above, defense counsel certainly left the jury with the clear impression that Soto would otherwise have faced a lengthier sentence but for the deal that limited his sentence to "only" 15 years with "no danger" of him facing more than 15 years.
*549 Importantly, defense counsel never asked Soto whether he would have faced a substantially or significantly longer sentence had he not accepted the deal. An appellate court should not speculate as to what the trial court's ruling would have been had such a question been posed, nor should this court announce that a reversal would have been avoided had such a question been permitted, when it was never asked.[5] It is not the role of the trial court to suggest to either side questions that counsel should ask, especially when no such input or direction was sought.
Furthermore, it is often the case with impeachment that the jury is not told every detail about the information used to impeach a witness. For example, when impeachment involves disclosing the witness's prior felony convictions under section 90.610, the jury usually hears only the number of such convictions without any information regarding the crimes for which the witness was convicted, even if otherwise relevant, such as convictions of perjury in previous trials. Likewise, where a witness is being impeached under section 90.609 based upon his or her reputation in the community as a liar, the jury typically hears only about the general poor reputation and is not given any information about specific lies or controversies that led to the witness's poor reputation. After all, the purpose of impeachment is to place the jury on notice that the witness's testimony may be unreliable and not worthy of consideration; it is not the goal to have mini-trials over the subject matter of the impeachment bases. Here, there was no consensus among the court and counsel as to whether, given Miller[6] and its progeny, Soto would truly have faced a life sentence. Rivera's jury would not have benefitted from a mid-trial seminar on what prison sentences could constitutionally be imposed on a homicidal juvenile. It is difficult to comprehend how the trial court possibly have erred at all, much less reversibly erred, in following the mandatory provisions of Rule 3.390(a), especially in light of what the jury knew about Soto's credibility and the instructions on how his testimony must be cautiously considered.
CONCLUSION
Soto's credibility was so thoroughly attacked, questioned, and warned about that it is inconceivable that the jury's verdict would have been any different had the one missing detail of Soto's deal-the sentence he otherwise faced-been provided. Thus, if there was any error, it was harmless beyond a reasonable doubt. State v. DiGuilio , 491 So. 2d 1129, 1135 (Fla. 1986). The jury's verdict and Rivera's conviction of first-degree murder with a firearm should be affirmed. Because the majority has reached a contrary decision, I must respectfully dissent.

Rivera was also convicted of aggravated assault with a firearm but does not challenge that conviction or sentence on appeal.

The dissent argues Rivera was required to specifically argue to the trial court that its ruling, restricting his right to cross-examine Soto about his plea deal, impaired his Sixth Amendment right to confront witnesses against him. Although Rivera did not specifically assert a Sixth Amendment violation, his attempt to cross-examine Soto on the full extent of his plea deal was clearly related to the right of confrontation, so much so that this Court may address the matter on its merits. See Evans v. State, 838 So. 2d 1090, 1097 n.5 (Fla. 2002) (per curiam) (finding failure to specifically assert Sixth Amendment violation will not preclude review where issue raised below "is closely related to the right of confrontation"), cert. denied, 540 U.S. 846, 124 S.Ct. 121, 157 L.Ed.2d 84 (2003).

Kayla flatly denied that she was armed; thus, either she or Soto was obviously lying to the jury about that fact.

Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

There was little danger that Soto may have blurted out the specific length of his sentence, as the trial court had counsel repeatedly question Soto through proffers before he actually testified.

Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).