# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D15-4430

_____

NICHOLAS RIVET,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Duval County.
Tatiana Salvador, Judge.

July 25, 2018

PER CURIAM.

Eddie Robb had just turned two when he was beaten to death. The police investigation immediately focused on the two adults home at the time of beating: Brandi Robb (the child's mother) and Nicholas Rivet (Brandi Robb's boyfriend). The three—mother, child, and Rivet—had lived together near Naval Station Mayport at the time of the beating.

Suspicious of the mother, police asked Rivet to meet with her while wearing a wire and later to call her on a recorded line. Suspicious of Rivet, police also asked the mother to call Rivet on a recorded line. For a while, the investigation turned up no obvious answers. Indeed, more than three years passed with no arrest.

The State eventually charged Rivet with second-degree murder. At his trial, the mother testified against Rivet, and Rivet's defense pointed back to the mother. Lawyers for both sides acknowledged that the death was a homicide and that it had to be either Rivet or the mother. The jury decided it was Rivet, convicting him as charged, and the court imposed a life sentence. Rivet now appeals.

I.

Many of the pertinent facts were essentially undisputed. Brandi Robb had two children, Eddie and Logan. After Robb separated from her husband, she and the children struggled financially, frequently staying with Robb's mother or others. For several weeks before Eddie's death, Robb and her children stayed with Rivet. Rivet, too, had recently separated from his spouse, and he needed help looking after his two children. Robb was not working, so she was able to watch all the children while Rivet, on active duty with the United States Navy, worked in port on the U.S.S. *Simpson*. Robb's car had been repossessed, so she drove Rivet's car to run errands and take Rivet to and from work.

Rivet and Robb became romantically involved, but they kept it a secret. They were both going through divorces and dealing with child custody issues, and knowledge of their relationship could have complicated things. Plus, Rivet could have faced discipline from the Navy, which forbade adultery. So although they lived together as boyfriend and girlfriend, they told others the relationship was more like a single dad and a live-in babysitter.

On January 25, 2010, Robb drove with the children to pick Rivet up from work. They returned home around 8:00 p.m., and Robb put Eddie to bed around 8:30. Robb and Rivet were together downstairs until after 9:00, when Rivet went upstairs to make sure the children were sleeping. When Rivet did not come down right away, Robb went upstairs as well. From outside Eddie's room, Robb heard Rivet telling Eddie to go to sleep. When Rivet left the room, he and Robb went back downstairs. After watching television for a while, the two decided to go to bed. Robb went to their bedroom while Rivet went to check on the children again.

When Rivet reentered the children's room, it looked to him like Eddie was having a seizure. He immediately called for Robb, who called 911. Paramedics came, and Eddie was life-flighted to a pediatric trauma center. He died there days later.

According to experts who testified at trial, Eddie suffered numerous injuries to his head and eyes, including a serious, fatal head injury. The overall injuries were so severe, the experts agreed, that they were certainly not caused by an accidental fall or anything similar. There was also expert testimony that immediately after the fatal trauma, it would have been obvious to anyone that Eddie was symptomatic, as he would have had an immediate altered level of consciousness and been unable to communicate normally. As one expert stated, "this is not the kind of brain injury that lets you walk around and smile and talk and play and then collapse later."

The State also presented evidence that Rivet lied to investigators when first questioned. At the very least, he lied about the nature of his relationship with Robb. Rivet also provided inconsistent statements regarding his last check on Eddie. Jurors heard that Rivet admitted on a recorded call that Eddie had been awake and crying when he was in the room—evidence that would undercut any theory that the fatal trauma preceded Rivet's final visit to the children's room. Jurors also heard evidence about a loud "thud" heard while Rivet was inside the room. And jurors heard Robb testify that when she saw Rivet leave the children's room, he sat at the top of the stairs, put his head in his hand, and said he "couldn't do this anymore"—all while sweating and appearing overwhelmed. (Robb did not think much of that episode at the time: "I took it as he couldn't help with Eddie and laying him down or looking in on him.")

But there was evidence the jury did not hear, evidence Rivet contends would point towards Robb. Rivet proffered testimony from several witnesses that Robb had a history of acting inappropriately—even violently—with her own children. One witness testified that Robb would yell and curse at children, and at least once forcefully yanked Eddie up from the ground. Another witness saw Robb lose her temper and spank her children in a violent, abusive fashion, using either her hand or a hair brush. A

third witness saw Robb slap the back of her other son's head with such force that the child almost fell over. That witness said Robb showed no reaction while she watched the child cry. The trial court excluded this evidence as irrelevant, finding Robb's prior acts insufficiently similar to those that killed Eddie.[1]

After considering all the evidence before it, and after considering arguments from the State that Rivet did it and arguments from Rivet that Robb did it, the jury convicted.

## II.

Rivet's first argument on appeal is that the trial court should have granted his motion for judgment of acquittal. At the close of the State's case, Rivet argued the evidence was entirely circumstantial and that "[a] reasonable hypothesis of innocence exists" because Robb was in the home and—according to her own testimony—had been frustrated with Eddie all day. The court denied the motion.

We review de novo an order denying a judgment of acquittal. *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002). "A criminal defendant is entitled to a judgment of acquittal if there is no direct evidence of guilt and if the circumstantial evidence does not exclude every reasonable hypothesis of innocence." *State v. Sims*, 110 So. 3d 113, 115 (Fla. 1st DCA 2013) (citing *State v. Law*, 559 So. 2d 187, 188-89 (Fla. 1989)).

Rivet's theory of events—both below and on appeal—is that Robb committed the crime.[2] Indeed, his position all along was that

---

[1] The jury did hear some evidence similar to that proffered. The jury heard, for example, that the mother used profanity in front of children, lost her temper with her children from time to time, and once expressed to friends thoughts of harming herself and her children.

[2] Although he does not try to do so, Rivet could not assert on appeal a theory of events not argued below. We have said that to preserve an argument that the evidence was insufficient to meet this standard, a defendant must "outline a theory of defense and

4

there were only two people who could have killed Eddie, and his counsel argued throughout trial that it must have been Robb. So the question is whether the State put on evidence disproving that theory. It did. It put on Robb herself, who unequivocally testified that she did not harm the child. The jury was entitled to believe Robb's testimony, and it apparently did. *See Law*, 559 So. 2d at 189 (after the State satisfies its threshold burden, "it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt").

Rivet relies on two cases in which courts have found evidence insufficient under the circumstantial-evidence standard. *See Long v. State*, 689 So. 2d 1055, 1058 (Fla. 1997); *Cox v. State*, 555 So. 2d 352, 353 (Fla. 1989). The theory of defense in those cases—like Rivet's theory here—was that another person perpetrated the crime. But neither of those cases involved a theory like Rivet's theory: that a *specific, identified person* committed the crime. Here, that specific, identified person (Robb) testified that she did not commit the crime. Therefore, the evidence was sufficient to defeat a motion for judgment of acquittal, even under the circumstantial-evidence standard.[3]

---

argue that the circumstantial evidence was consistent, rather than inconsistent, with that theory." *Newsome v. State*, 199 So. 3d 510, 513 (Fla. 1st DCA 2016); *see also Pitts v. State*, 227 So. 3d 674, 677 (Fla. 1st DCA 2017) (noting that appellant cannot "concoct a new theory of innocence" on appeal).

[3] We reject Rivet's separate argument that the conviction required an improper stacking of inferences. *See Donton v. State*, 1 So. 3d 1092, 1099 (Fla. 1st DCA 2009) ("An impermissible pyramiding of inferences occurs where at least two inferences in regard to the existence of a criminal act must be drawn from the evidence and then stacked to prove the crime charged; in that scenario, it is said that the evidence lacks the conclusive nature to support a conviction.") (quoting *Graham v. State*, 748 So. 2d 1071, 1072 (Fla. 4th DCA 1999)). This argument was not preserved and, regardless, fails on the merits.

III.

Rivet's next argument is that the trial court should have permitted him to introduce evidence of Robb's prior misconduct involving children. Specifically, Rivet sought to introduce testimony that Robb would lose her temper and act physically and verbally abusive toward Eddie and other children. The State moved to exclude this evidence as irrelevant, arguing that Robb's prior acts were not similar enough to the acts that caused Eddie's fatal injuries. The trial court agreed and excluded the evidence.

Evidence is generally admissible if it is relevant, and relevant evidence is "evidence tending to prove or disprove a material fact." §§ 90.401-.402, Fla. Stat. (2017). But courts generally exclude evidence that a defendant committed crimes other than those for which he is on trial. *Seibert v. State*, 923 So. 2d 460, 471 (Fla. 2006). Evidence of a defendant's prior crimes may well be relevant, but that evidence is "inherently prejudicial because it creates the risk that a conviction will be based on the defendant's bad character or propensity to commit crimes, rather than on proof that he committed the charged offense." *McLean v. State*, 934 So. 2d 1248, 1255 (Fla. 2006) (marks and citation omitted). There is a special rule, though, that can allow introduction of a defendant's prior bad acts in certain circumstances. *McDuffie v. State*, 970 So. 2d 312, 323 n.2 (Fla. 2007). This rule, known as the *Williams* rule, has been codified in section 90.404(2), Florida Statutes. *Id.* Under that rule, "[s]imilar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." § 90.404(2), Fla. Stat. The rule also provides that such evidence "is inadmissible when the evidence is relevant solely to prove bad character or propensity." *Id.*

The typical *Williams*-rule issue arises when the State seeks to introduce evidence of a defendant's similar past crimes. *See, e.g.*, *Cozzie v. State*, 225 So. 3d 717, 731 (Fla. 2017); *Kroll v. State*, 221 So. 3d 1291, 1291 (Fla. 1st DCA 2017). In this case, the issue is "reverse *Williams* rule" evidence. *See Washington v. State*, 737 So. 2d 1208, 1225 (Fla. 1st DCA 1999) (noting that the "upshot" of *Williams* rule evidence "is that an accused may show his innocence

by proof tending to show another person's guilt"); *see also McDuffie*, 970 So. 2d at 323 n.2 ("'Reverse *Williams* rule' evidence is evidence of a crime committed by another person that a defendant offers to show his or her innocence of the instant crime."). Rivet sought to introduce evidence that another person (Robb) committed the crime. Robb was not on trial, so introduction of evidence implicating her would not have raised the same due process concerns underlying the *Williams* rule. *See U.S. v. Cohen*, 888 F.2d 770, 777 (11th Cir. 1989) ("When the defendant offers similar acts evidence of a witness to prove a fact pertinent to the defense, the normal risk of prejudice is absent."). In fact, because of the different interests at issue, many courts relax the standard for admitting this type of evidence. *See, e.g.*, *U.S. v. Harrison*, 627 Fed. Appx. 857, 859 (11th Cir. 2015) ("The standard for admission is relaxed when evidence of prior bad acts is offered by a defendant and involves behavior of a witness other than a defendant."); *U.S. v. Williams*, 458 F.3d 312, 313 (3d Cir. 2006) (recognizing that court grants defendants "more leeway" in introducing "bad acts" evidence). Indeed, the due process factors weigh more in favor of introducing it. *See Washington*, 737 So. 2d at 1221 ("The constitutional guarantees of due process provide for the admission of evidence relevant to the defense of the accused, and it is clear that '[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.'" (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973))); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purposes of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.").

Nevertheless, the Florida Supreme Court has explicitly held that when a defendant seeks to introduce another person's prior bad acts "to shift suspicion from himself to another person," then "evidence of past criminal conduct of that other person should be of such nature that it would be admissible if that person were on trial for the present offense." *State v. Savino*, 567 So. 2d 892, 894 (Fla. 1990). In light of this precedent, we must determine whether the disputed evidence satisfied the general *Williams* rule standard. In other words, we must determine whether it would

7

have been admissible against the mother if she were on trial for Eddie's death. We conclude it would not have been.

Where the purported relevancy of *Williams* rule evidence is to prove identity (as is the case here), there must be "a close similarity of facts, a unique or 'fingerprint' type of information, for the evidence to be relevant." *Savino*, 567 So. 2d at 894. The proffered testimony was that Robb had slapped her son Logan in the head forcefully, had lost her temper and yelled and cursed at other children, and had spanked and yanked Eddie up by the armpit. In contrast, the evidence at trial suggested Eddie received at least three severe blows to the head with such force to bruise multiple areas of his skull, to cause nerve damage to his brain, and to detach one of his retinas—blows that ultimately killed him.

We conclude that the proffered testimony was too dissimilar to be admissible as *Williams* rule evidence. *Cf. Washington*, 737 So. 2d at 1225 (finding reverse *Williams* rule evidence should have been admitted because the witness's prior bad acts were "strikingly consistent with the type of acts" that caused the victim's death). And because binding supreme court precedent requires us to apply the same standard to the reverse *Williams* rule evidence here, *see Savino*, 567 So. 2d at 894 ("[W]e disagree that the degree of similarity of such crimes to be relevant should be modified when identity is sought to be proved, even though it is less likely that prejudice would occur when evidence of other crimes is sought to be introduced by a defendant."), we conclude the trial court did not abuse its discretion in disallowing the proffered testimony.[4]

---

[4] Below, defense counsel argued the proffered evidence was relevant to prove Robb's motive for accusing Rivet. *See Finney v. State*, 660 So. 2d 674, 681-82 (Fla. 1995) ("Overall similarity between the facts of the two offenses generally is necessary before the other crime evidence is considered relevant to the issue of identity. However, such is not the case when other crime evidence is used to prove motive."); *Washington*, 737 So. 2d at 1224 ("Even without the requisite higher degree of similarity to prove identity, evidence of other crimes, wrongs, or acts may properly be used to

## IV.

Finally, Rivet argues the lower court erred in denying his post-trial motion to interview a juror. The juror had served in the Navy on the same ship as one of the witnesses, along with the husbands of two other witnesses. The juror had also been to the home of one of the witnesses for a social event, which Robb had also attended. But because defense counsel filed the motion fourteen days after the trial, despite discovering the issue during the trial, the lower court denied the motion as untimely without good cause. *See* Fla. R. Crim. P. 3.575 (requiring a motion to interview a juror "be filed within 10 days after the rendition of the verdict, unless good cause is shown for the failure to make the motion within that time"). We find no abuse of discretion.

AFFIRMED.

OSTERHAUS, JAY, and WINSOR, JJ., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

Christopher E. Cosden, Fort Myers, for Appellant.

Pamela Jo Bondi, Attorney General, and Samuel B. Steinberg, Assistant Attorney General, Tallahassee, for Appellee.

---

prove, *e.g.*, motive, intent, plan, or absence of mistake."). But because Rivet has not raised this argument on appeal, we do not address it. *See Anheuser-Busch Companies, Inc. v. Staples*, 125 So. 3d 309, 312 (Fla. 1st DCA 2013) ("[W]e are not at liberty to address issues that were not raised by the parties.").